CENTRAL TRUST CO. OF NEW YORK v. WHEELING & L. E. R. CO. et al.

NATIONAL CAR WHEEL CO. v. SAME.

(District Court, N. D. Ohio, E. D. at Cleveland. January 5, 1914.)

No. 25.

1. RAILROADS (§ 165*)—MORTGAGES—VALIDITY.

A mortgage executed by a railroad company to secure bonds which were pledged as collateral to notes the proceeds of which were needed and used in conducting its business *held* valid, as against the company, although it was at the time dominated by another company which owned a majority of its stock and also as against mortgagees of the latter company to whom the stock was pledged.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 510½–515; Dec. Dig. § 165.*]

2. RAILROADS (§ 165*)—PLEDGE OF BONDS—LEGALITY—OHIO STATUTE.

Rev. St. Ohio, § 3290 (Gen. Code Ohio, § 8797), which provides that the directors of a railroad company "may sell, negotiate, mortgage or pledge its own bonds or notes at such rates and for such prices, not less than 75 cents on the dollar, as in their opinion will best advance the interests of the company," imposes a limitation on the directors with respect to the price or amount for which bonds may be sold or pledged, and a pledge of such bonds to secure an indebtedness of less than 75 per cent. of the par value of the bonds is illegal as to the excess.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 510½–515; Dec. Dig. § 165.*]

3. RAILROADS (§ 139*)—LIENS—TRAFFIC CONTRACTS.

Contracts between railroad companies for interchange of business on a stated division of joint tariffs do not create a lien on the property or earnings of either company, but are merely personal obligations.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 440–442; Dec. Dig. § 139.*]

4. RAILROADS (§ 137*)—TRAFFIC CONTRACTS—VALIDITY.

A traffic and trackage contract between three railroad companies to be in force for 20 years set aside at suit of the receiver of one of the companies as inequitable and unfair to such company, which was at the time it was made controlled by directors who were also directors of the other companies.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 435; Dec. Dig. § 137.*]

5. RAILROADS (§ 169*)—TRAFFIC CONTRACTS—ENFORCEMENT BY MORTGAGEE.

A mortgagee of a railroad company has no greater right than the company itself to enforce an illegal traffic contract made prior to the execution of the mortgage.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 536–548; Dec. Dig. § 169.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. RAILROADS (§ 208*)—INSOLVENCY AND RECEIVERS—INVALID TRAFFIC CON-
   TRACT—ACCOUNTING.
   The right of the receiver of an insolvent railroad company to an ac-
   counting for sums paid or due to other companies under a traffic contract
   set aside as invalid considered.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 685–691; Dec.
   Dig. § 208.*]

In Equity. Suit by the Central Trust Company of New York against
the Wheeling & Lake Erie Railroad Company and others, consolidated
with suit of the National Car Wheel Company against the same de-
fendants. Final hearing on original and cross-bills.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio
(James H. Hoyt, Hermon A. Kelley, and William B. Stewart, all of
Cleveland, Ohio, of counsel), for complainant.

Squire, Sanders & Dempsey, of Cleveland, Ohio (Andrew Squire,
William B. Sanders, and Robert F. Denison, all of Cleveland, Ohio, of
counsel), for defendant Wheeling & L. E. R. Co.

Frank H. Ginn, Robert M. Calfee, and Joseph G. Fogg, all of Cleve-
land, Ohio, for cross-complainant Duncan.

Guggenheimer, Untermyer & Marshall, of New York City (Louis
Marshall, of New York City, of counsel), for defendants Wabash-
Pittsburgh Terminal Ry. Co. and its receivers.

Alexander & Green, of New York City (W. W. Green, of New
York City, of counsel), for defendant Bankers' Trust Co. of New
York.

Byrne & Cutcheon, of New York City (Franklin W. M. Cutcheon
and W. R. Begg, both of New York City, of counsel), for defendant
New York Trust Co.

John Quinn, of New York City, for defendant Equitable Trust Co.
of New York.

Smith & Beckwith, of Toledo, Ohio (Alex L. Smith, of Toledo,
Ohio, of counsel), for defendants Wabash Railroad Co. and its re-
ceivers.

Holmes, Rogers & Carpenter, of New York City (Delevan A.
Holmes, of New York City, of counsel), for cross-petitioners and in-
terveners.

DAY, District Judge. In the year 1901 and for some time prior
thereto, the Wheeling & Lake Erie Railroad Company owned and
operated a steam railroad, extending from Toledo, easterly across Ohio,
to Wheeling, W. Va.; also a line of railroad extending from Cleve-
land to Zanesville; and also had a branch line to Huron on Lake Erie,
several other branch lines, and a belt line in Cleveland. At Toledo,
connection was had by means of Belt lines with the line of the Wa-
bash Railroad Company, which company operated extensive lines of
railroad in the Middle West, and branches running to St. Louis, Chi-
cago, and Toledo. Throughout this memorandum, the Wheeling &
Lake Erie Railroad Company will be referred to as the "Wheeling,"
the Wabash-Pittsburgh Terminal Railway Company will be referred

to as the "Terminal," and the Wabash Railroad Company will be referred to as the "Wabash."

Prior to 1901, there had been no community of interest between the Wheeling and the Wabash, but early in that year a plan was devised to give the Wabash an entrance into Pittsburgh. Under date of February 1, 1901, the Pittsburgh-Toledo Syndicate was formed by written agreement. Louis Fitzgerald, president of the Mercantile Trust Company of New York, George J. Gould, a director of the Wabash, and Joseph Ramsey, Jr., vice president and general manager of the Wabash, were designated as syndicate managers. Later others were added to this managing board. The object of this syndicate was the building of a line of railroad into Pittsburgh to connect with the Wabash from the Wheeling, for the purpose of giving the Wabash an entrance into Pittsburgh. To accomplish this main purpose, at first $15,000,000, which was presently increased to $20,000,000, were subscribed. Immediately after the organization of the syndicate, the syndicate managers who had previously conferred with Andrew Carnegie, and received assurance of an extensive traffic in the steel business, entered into a contract with the Union Railroad Company and the Carnegie Steel Company, at Pittsburgh, whereby the syndicate managers, in consideration of receiving certain traffic, agreed to do all that was necessary to secure or lease such lines of railroad as would be required to make a continuous connection with these two small railroads in the vicinity of Pittsburgh, to Toledo, and thence from Toledo with the Wabash, and to arrange a close traffic contract, or alliance, with the Wabash or secure trackage rights over the tracks of the Wabash to Chicago, or both.

Within a few days after this agreement, Mr. Gould proceeded to acquire a large interest in the stock of the Wheeling. The syndicate managers later acquired or constructed several small railroads near Pittsburgh, which on May 7, 1904, they consolidated into the Terminal. The stock of the Wheeling acquired by Mr. Gould for the syndicate enabled the syndicate in May, 1901, to reorganize the board of directors of the Wheeling and its executive committee, to elect Mr. Ramsey president of the Wheeling, and name a finance committee of three, including Mr. Gould and Mr. Ramsey. Thereafter, the New York offices of the Wheeling were transferred to the New York offices of the Wabash, and Mr. Ramsey's office as president of the Wheeling was moved to St. Louis, where was also his office as president of the Wabash. The syndicate also acquired all of the stock of the West Side Belt Line, a small railroad in the vicinity of Pittsburgh, by purchase of the stock of the Pittsburgh Terminal & Railroad Coal Company.

On October 10, 1902, the Wabash, the Wheeling, and the Pittsburgh, Carnegie & Western Railroad Company, one of the constituents of the Terminal Company entered into the so-called traffic and trackage contract, which plays an important part in this litigation. This contract was authorized by the Wheeling directors on May 1, 1901. The board at this time consisted of Mr. Gould, Mr. Ramsey, and two other men at that time directors of the Wabash, certain other directors who were

connected with the Pittsburgh-Toledo Syndicate, and certain other directors who might be termed "dummy directors," as that term is now well understood. This contract was prepared by the general counsel of the Wabash, and Mr. Ramsey, and authorized by the Wabash directors on August 8, 1901, after the approval of Mr. Gould had been secured.

The agreement recited, among other things:

"Whereas, the first party (the Wabash) owns, controls and operates certain lines of railroad, extending from Toledo in the state of Ohio, to the cities of East St. Louis and Chicago in the state of Illinois, and other western points, and a line extending from East St. Louis in the state of Illinois, via Detroit to Buffalo, with various branch lines; and

"Whereas, the second party (the Wheeling) owns, controls and operates connecting lines of railway in the state of Ohio, extending from the city of Toledo to the cities of Wheeling and Steubenville and a road extending from Cleveland to Zanesville in said state, with various branches; and

"Whereas, the said third party (Pittsburgh, Carnegie & Western Railroad Company) proposes to build, and is now constructing a line of railroad extending in a westerly direction from the city of Pittsburgh in the state of Pennsylvania, through West Virginia and Ohio to a connection with the main line of the railroad of the second party, in the state of Ohio; and

"Whereas, the said first party has no line of its own extending eastwardly from Toledo, through Ohio, West Virginia and Western Pennsylvania (all lines of railway in that territory except the Wheeling and Lake Erie Railroad being under control and operated by railway companies competitive with said first party), and said first party is therefore unable to secure the amount of freight and passenger traffic to or from said territory which it is desirous of securing; and

"Whereas, the said second party has no line of its own west of Toledo, and is desirous of friendly connection with lines extending to Chicago, East St. Louis and the West, and also desires the construction of a railroad from a point on its main line in Ohio, to Pittsburgh; and

"Whereas, the third party is ready and willing to construct said extension and secure the necessary freight and passenger terminals in said city of Pittsburgh, and operate its said railroad in close and friendly alliance with said first and second parties, provided said first and second parties will enter into the friendly traffic and trackage relations hereinafter set forth and provided for, and which said third party believes will justify it in expending the large sums of money necessary to construct such extension and furnish such terminals in the city of Pittsburgh."

Section 3 of article 2, also shows that the contract was for the purpose of aiding in the construction of the Terminal Company line; it reading as follows:

"Sec. 3. In consideration of the great cost of the lines of said third party into Pittsburgh and its heavy expenditures and outlays of money for terminals and terminal expenses in said city, and as an inducement to said third party to construct its road and make such expenditures, the parties of the first and second parts hereby agree that, in fixing said schedule of percentages, said third party shall have and be allowed an arbitrary mileage of not less than one hundred miles (instead of its actual mileage of about sixty-five miles) on all freight traffic passing over its road between Pittsburgh and a connection with the tracks of the second party excepting on such traffic as originates on the line of the party of the third part and terminates on the line of the second party within one hundred miles of Pittsburgh, on which traffic it shall receive an arbitrary allowance of ten cents per ton as compensation for originating such traffic, and in addition thereto, it shall receive its agreed percentage of the balance of the earnings."

The contract was to continue in force for 20 years from the date of commencement of business. This agreement, in addition to its authorization by the stockholders and directors of the Wabash, was approved by the directors of the Wheeling on December 20, 1901, and on February 14, 1902, at a meeting of the Wheeling board of directors, consisting of 12 members, including four members of the Wabash board, three members connected with the syndicate, and five directors, none of which five directors owned any beneficial interest in the stock of the Wheeling, the contract was approved, and such of the directors as were also on the board of directors of the Wabash were excused from voting. The annual meeting of the stockholders of the Wheeling was held on May 7, 1902. A notice dated April 15, 1902, was issued, and stated, among other things:

"And for the purpose of submitting to the stockholders for their approval or disapproval a certain traffic and trackage contract, which has already been approved by the board of directors."

Article 4 of the regulations of the Wheeling at the time of the stockholders' meeting provided:

"The secretary shall give notice of the time and place of all annual or special meetings to the stockholders by mailing at least ten days before such meeting, postage prepaid, a written or printed notice addressed to each stockholder at his or her last known address, and by giving such other notice as may be required by law."

At this stockholders' meeting, Mr. Ramsey and three others holding proxies were present. Mr. Blickensderfer, who was general manager of the Wheeling at this time, and apparently a disinterested witness, testified that at about the time of this meeting he remarked to Mr. Ramsey that the proposed contract was unfair to the Wheeling, and that the Wheeling was being asked to carry too much of the burden of the Terminal, and that Mr. Ramsey replied, "It was all in the family, and didn't make any difference that he could see." This was denied by Mr. Ramsey.

At the time of the making of this contract, the Pittsburgh, Carnegie & Western Railroad Company had no physical possession which could be termed a railroad. After this contract, the syndicate proceeded to build the Terminal property at a great expense. The syndicate subscribers would not accept the Terminal bonds, and accordingly, in order to finance the Terminal, the so-called supplemental traffic and trackage contract of May 10, 1904, was executed.

Under date of April 13, 1904, the syndicate addressed a communication to the Wabash and to the Wheeling, which referred to the consolidation of the properties of the Wabash, the Wheeling, and of the Terminal. This communication stated that the syndicate would transfer to the Terminal all the stock of the Wheeling owned by the syndicate, which was a majority, and that of the Terminal Company's first mortgage 55-year 5 per cent. gold bonds of a total authorized issue of $50,000,000; the Wabash was to purchase $6,600,000 par value of these bonds, for $6,000,000, and the Wabash was to deliver to the syndicate $10,000,000 par value of Wabash stock, to execute a supplemental agreement and receive $10,000,000 par value of the capital

stock of the Terminal Company. This was approved by the Wabash directors on April 14, 1904, and by the Wheeling directors on April 18, 1904, which directorage was practically the same as that of December 20, 1901.

It does not appear that any copy of the proposition was recorded, but it does appear that the proposition was referred to the executive committee with full power to act. The proposition was submitted to the stockholders and directors of the Terminal Company and approved May 11, 1904. The annual meeting of the Wheeling stockholders was held May 4, 1904, in pursuance of a notice dated April 4, 1904, which stated that the purpose of the meeting was "for the purpose of electing directors of said company, also to ratify the purchase of the properties or the securities representing the properties of the Pittsburgh, Lisbon & Western Railroad Company and of the Lake Erie, Youngstown & Southern Railway Company, and for the transaction of such other business as may be brought before the said meeting." This so-called supplemental traffic and trackage contract provided, among other things, for an extension of the original traffic and trackage contract, so as to make its duration fifty years.

The contract provided, among other things, as follows:

"Section 1. It is agreed that the gross revenue of the parties of the first and second parts derived east of Chicago and St. Louis, from all classes of traffic interchanged by said parties with the party of the third part or passing over the road of the party of the third part, and the gross revenue of the party of the third part derived from all classes of traffic interchanged by said party with the parties of the first or second parts or passing over the road of the party of the third part and delivered to the roads of the parties of the first or second parts, or either of them, shall, when ascertained be divided as follows:

"Sec. 2. The gross revenue of each party hereto from the traffic aforesaid shall be ascertained and determined in the manner provided in said traffic and trackage contract of October 10, 1902, and there shall then be allowed and paid by the parties of the first and second parts, to the party of the third part, out of gross revenues of the said parties of the first and second parts derived from such interchanged traffic, in addition to the revenue of said party of the third part as so ascertained, additional sums, to be determined from time to time as hereinafter provided, which shall in no event exceed in amount twenty-five per cent. of the gross revenue derived by the parties of the first and second parts from said traffic, and the total amount of said additional payments shall never exceed a sum which, when taken together with the net earnings and revenue of the party of the third part, will be equal to the interest upon all of the first and second mortgage bonds then outstanding of the party of the third part issued under and secured by its first and second mortgages dated May 10, 1904. The amount of said additional payments to be made by the parties of the first and second parts as herein provided shall be prorated as between said parties upon the basis of their respective gross revenue derived as aforesaid from said traffic."

The offer which has been referred to was accepted by the Terminal Company, and, in order to enable it to perform its part of the agreement, its capital stock was increased from $4,000,000 to $10,000,000. It issued its bonds in conformity to the proposition, and executed two mortgages, both dated May 10, 1904; the first to the Mercantile Trust Company, to secure an authorized issue of $50,000,000 at 4 per cent. 5-year gold bonds, the second to the Equitable Trust Company to secure an authorized issue of $20,000,000 of second mortgage 4 per

cent. 5-year gold bonds. Both of these mortgages conveyed to the respective trustees the railroad of the Terminal Company and pledged the shares of the Wheeling Company held by the Terminal Company, and the mortgages also conveyed, among other things:

"Any and all leaseholds, leases, rights under leases or contracts, trackage agreements or operating arrangements, covenants and agreements, terms or parts of terms, including all the rights of the railway company under a certain traffic and trackage contract dated October 10, 1902, and executed by the Wabash Railroad Company, the Wheeling & Lake Erie Railroad Company, and the Pittsburgh, Carnegie & Western Railroad Company (of which last-named company the railway company, party hereto of the first part, is the successor), and under a certain contract bearing even date herewith supplemental to said traffic and trackage contract (counterpart originals of which original and supplemental contracts have been deposited with the trustee hereunder)."

Section 5 of article 3 of the first mortgage of the Wabash-Pittsburgh Company covenants:

"That it will not voluntarily create, or suffer to be created, any debt, lien or charge which would be prior to the lien of these presents upon any property which shall have become subject to this indenture or any part thereof, or upon the income thereof."

Section 6 of article 3 of the second mortgage contained language to the same effect.

Section 5 of article 3 of the first mortgage provides:

"If any company, all of whose bonds and outstanding capital stock (less the number of shares necessary to qualify directors) shall be subject to this indenture, shall voluntarily create or suffer to be created any additional lien or charge upon its property or income, or shall create or shall suffer to be created any additional indebtedness other than indebtedness to the railway company (the Wabash-Pittsburgh Terminal) or indebtedness for the current expenses of such company, then the railway company (the Wabash-Pittsburgh Terminal) will at once acquire such lien, charge or indebtedness and cause the same to be vested in the trustee or will cause the same to be paid or discharged."

Section 8 of article 3 of the first mortgage provides:

"Except as in this indenture expressly authorized, the railway company (the Wabash-Pittsburgh Terminal) will not by its affirmative vote or consent, or by abstaining from voting, sanction or permit any increase of the capital stock of any company, all of whose outstanding capital stock (less the number of shares necessary to qualify directors) now is or hereafter shall be subject to this indenture, or the creation of any indebtedness of any such company (except current accounts growing out of operation) or the issue or the guaranty of any bonds by any such company, or the creation of any mortgage or other lien upon the railroad or property of any such company unless effective provision be made that such indebtedness and the evidences thereof and such bonds issued or guaranteed and such mortgage or other lien and all such additional stock, shall forthwith, upon the issue or creation thereof, be transferred to the trustee, by it to be held subject to all the trusts of this indenture; and all such additional stocks shall be fully paid and non-assessable."

Section 2 of article 4 of the first mortgage gives the Wabash-Pittsburgh Terminal:

"The right to vote upon all shares of stock pledged hereunder for any and all purposes not inconsistent with the provisions and purposes of this indenture, and with the same force and effect as though such pledge had not been made, but subject to the restrictions and agreements herein contained."

In offering the bonds issued under these mortgages for sale, the bankers issued literature, asserting that the bonds were secured by the original and supplemental traffic and trackage contracts. Operation under these contracts referred to as the traffic and trackage contracts was begun July, 1904. There was no interchange of traffic, however, under this contract, until October, 1904. On August 1, 1905, the Wheeling executed and delivered to the Central Trust Company of New York, as trustee, a general mortgage covering all of its property, as well as the traffic and trackage contracts, to secure the issuing of $35,000,000 of general mortgage bonds, dated August 1, 1905, maturing August 1, 1955, bearing interest at 5 per cent. $12,000,000 par value of these bonds were to be used as provided in subsection "a," § 2, of article 2 of the mortgage, which provided:

"$12,000,000 par value of the bonds mentioned in this section shall immediately upon the execution and delivery of this indenture or as soon thereafter as may be required by the railroad company be authenticated by the trustee and delivered to the trustee of a certain trust agreement bearing even date herewith, executed by the railroad company to the New York Trust Company as trustee, to be held by said trustee, subject to all the terms and provisions of said trust agreement, and, upon the payment of all of the notes issued under said trust agreement and the satisfaction of the same, said bonds, or so many thereof as shall then remain in the hands of said trustee, together with any moneys then remaining in its hands, the railroad company agrees to deliver and pay over or cause to be delivered and paid over to the trustee of this indenture, and shall thereafter be authenticated and delivered or paid out by it only for some one or more of the purposes and subject to the restrictions set forth and declared in subdivision B of this section."

The Wheeling, as of August 1, 1905, entered into with the New York Trust Company a certain trust agreement, which trust agreement was for the purpose of authorizing the issuance and securing the payment of $8,000,000 par value of 3-year 5 per cent. gold notes of the Wheeling dated August 1, 1905.

The property pledged by the trust agreement is as follows:

"(1) Twelve million dollars ($12,000,000) par value of general mortgage fifty-year four per cent. gold bonds out of an authorized issue of thirty-five million dollars ($35,000,000) par value thereof, said bonds being dated and bearing interest from August 1, 1905, and being issued under and secured by a certain mortgage or deed of trust dated August 1, 1905, to the Central Trust Company of New York as trustee."

Also:

"(2) All of the right, title and interest of the railroad company in and to any and all rolling stock and equipment purchased or acquired by the use of said gold notes or their proceeds, including the following described rolling stock and equipment, which was leased and demised by the New York Trust Company by lease dated August 15, 1905, and filed for record in the office of the Secretary of State of Ohio on the 19th day of August, 1905.

"Fifty (50) Consolidation Locomotives Nos. 2101 to 2150, inc.

"Six (6) Six-wheel Switching Locomotives Nos. 2201 to 2206, inc.

"Six (6) Atlantic Type Passenger Locomotives Nos. 2001 to 2006, inc.

"Two thousand (2,000) 80,000 pounds capacity Gondola Cars Nos. 44,000 to 44,999 inc., and from 47,000 to 47,999 inc."

The execution of the note agreement and the general mortgage, and the execution of the general mortgage bonds, and their pledge under the note agreement, the execution and issuance of the three-year notes,

were authorized by the directors and stockholders of the Wheeling, and were voted for by the Terminal Company, which was the owner of the majority of the stock of the Wheeling. The Wheeling executed its note agreement, its three-year notes, its general mortgage, and general mortgage bonds, pledged the $12,000,000 of general mortgage bonds with the trustee, under the note agreement, and sold and delivered all of its three-year notes in the city of New York. The notes and bonds and interest thereon were all payable at New York City. The $8,000,000 of three-year notes were sold by the Wheeling to the Wabash at 95 and accrued interest, for the aggregate sum of $7,692,-222.22. The money thus realized was used for the purposes of the Wheeling road.

It appears that the whole transaction was arranged and carried out at the instance of and with the co-operation of the officers and directors of the Terminal Company, several of whom were also officers and directors of the Wabash. The $8,000,000 of three-year notes having been sold to the Wabash Company, that company placed its guaranty upon them, and sold them to purchasers for value, not parties to this litigation, by whom they were held, until August 1, 1908, when they were to become due. On that date, and subsequent thereto, Kuhn-Loeb & Co. and Blair & Co., and their associates, pursuant to a written agreement entered into by them with the Wabash Company, and pursuant to an offer so to do, published on July 31 and August 1, 1908, purchased all of the $8,000,000 notes at the price of the face value and accrued interest; all with the exception of $917,000 were purchased on August 1st.

The agreement under which these notes were purchased provided, among other things, that they should be purchased for the account of the Wabash and should be retained and held by the two firms of bankers mentioned, until the bankers' advances should be repaid or the notes themselves should be taken over by the bankers, in consideration of the cancellation of their claims. The Wabash having defaulted in the performance of its obligations, under the agreement with the bankers, the notes were brought in by the bankers for substantially the amount of their claims under their contract with the Wabash. The amount paid by them to the original noteholders was approximately $8,200,000, and the bid by them for the collateral and satisfied by its transfer was approximately $9,700,000. At the time the notes were issued, and the mortgage executed, the Wheeling was in need of funds, and it seems quite plain from the record that the money derived from the proceeds of these notes was paid to the Wheeling and used by it for its corporate uses and purposes.

The agreement between the Wabash and the bankers was made in July, 1908, after the Wheeling had gone into the hands of a receiver, in the preceding month of June.

At the time the bankers purchased the notes, it does not appear that the Wabash was insolvent. In December, 1911, the Wabash went into the hands of receivers, by reason of its insolvency. On August 6, 1913, the Bankers foreclosed the rights which the Wabash claimed to have in the notes, themselves purchasing the notes and coupons.

Prior to these transactions, on August 13, 1908, the Wabash made demand on the Wheeling and its receiver, for the payment of the notes and interest, and on September 15, 1908, the Wabash caused the Central Trust Company to proceed to foreclose the general mortgage.

It might be stated that in addition to these general facts that in March, 1907, the Wabash leased to the Wheeling 2,000 gondola cars, 30 consolidated locomotives, and 8 switch engines. The rentals accruing under this lease up to the time of the Wheeling receivership amounted to about $543,650, upon which the Wheeling has paid $60,-000 in cash, and the Wabash is asserting a claim for $474,650 under this equipment lease.

There are other facts which are pertinent in reference to certain of the cross-bills, but which need only be considered briefly as the various issues are referred to.

This suit had its commencement in June, 1908, when the National Car Wheel Company filed a bill of complaint in this court against the Wheeling, urging its insolvency, and praying for the appointment of a receiver. On the same day, the Wheeling filed an answer, admitting the allegations of the bill, and a receiver was appointed.

On September 15, 1908, the Central Trust Company filed a bill for the foreclosure of a general mortgage, and the same receiver was appointed in this suit, which was consolidated with the National Car Wheel Company suit.

Thereafter, the New York Trust Company, as trustee, the Mercantile Trust Company, since merged into the Bankers' Trust Company, the Equitable Trust Company, the receivers of the Wabash-Pittsburgh Terminal Railway Company, and the Wabash Railroad Company became parties. Later, the receiver of the Wheeling & Lake Erie Railroad Company filed a cross-bill, as did E. E. Carpenter et al. The pleadings are voluminous, and it will be impracticable to analyze them or set out in detail the testimony offered at the hearing.

I have carefully considered the record, and will endeavor briefly to outline the various issues raised by the pleadings without trying to discuss them to any great extent, nor to cite any authorities, other than those that are essential for the purpose of indicating in an informal way the conclusions reached.

The bill of the Central Trust Company alleges default in payment of the principal and interest on the notes, and in payment of the interest on the bonds, and prays a determination of the amount due, to the trustee, and the payment either directly or out of the proceeds of the sale of property, subject to the mortgage which it seeks to have foreclosed.

The New York Trust Company prays a decree of payment and in default thereof the sale of the $12,000,000 mortgage bonds and equipment covered by the trust agreement, and the application of the proceeds to the payment of the principal and interest on the notes.

The receiver claims that the mortgage was executed under the domination of the Wabash; that part of the rolling stock bought with some of the money derived from the note sale was afterwards diverted to the Terminal and the Wabash; and that under the provisions of

section 3290 of the Revised Statutes of Ohio (the same section being section 8797 of the Ohio. General Code) the bonds were issued and pledged in violation of the Ohio Laws, and are accordingly invalid and unenforceable.

Carpenter et al. claim priority over the general mortgage, on certain equitable rights which will later be discussed.

The receivers of the Terminal Company claim that the Wheeling had no authority to execute the mortgage or notes, and that they were pledged illegally by reason of section 3290 of the Ohio Statutes, and assert certain rights as a stockholder of the Wheeling, which rights, it is urged, were violated by the execution of the general mortgage and the pledging of the bonds, and also assert rights under the traffic and trackage contracts which it is claimed were violated by the giving of the general mortgage.

The Mercantile Trust Company and the Equitable Trust Company claim that the security pledged to them and covered by their mortgages will be damaged if the general mortgage is upheld, and the security which it is claimed will be damaged is: First, 51 per cent. of the stock of the Wheeling & Lake Erie Railroad Company which was owned by the Terminal Company; second, the traffic and trackage contracts which, it is claimed, were mortgaged by the Terminal Company to the two trust companies, the mortgage covering which contracts it is asserted had a priority in this property over the general mortgage of the Wheeling.

[1] It is not important whether the Wheeling was dominated by the Wabash or by the syndicate, in so far as the transactions related to the issuance of the notes and bonds under the mortgage is concerned. The proceedings in reference to the issuance of the notes and the mortgage do not appear to have been actuated by any fraud or evil purpose. The money raised by the note sale was paid to the Wheeling, accepted by it, and expended by it for its corporate uses and purposes, and this money was received at a time when the Wheeling was very much in need of funds. If the rolling stock purchased with the proceeds of this note sale were afterwards misused, and diverted, that objection cannot be raised as against the notes and mortgages after the payment of this money. It does not appear from the record that any part of the money derived from the loan went to any other source than the Wheeling.

[2] It is urged that the corporate act of the Wheeling in issuing the $12,000,000 of bonds under the general mortgage was in contravention of the terms of section 3290 of the Ohio Revised Statutes (section 8797 of the General Code), and that accordingly the bonds are void.

This section of the Ohio law provided:

"The directors of the company may sell, negotiate, mortgage, or pledge its own bonds or notes, as well as notes, bonds, scrip, or certificates for the payment of money or property which the company receives as donations, or in payment of subscriptions to the capital stock, or for other dues of the company, at such times and in such places, either within or without the state, and at such rates and for such prices, not less than seventy-five cents on the dollar, as, in their opinion will best advance its interests. If such notes or bonds

are thus sold at a discount, without fraud, the sale shall be as valid in every respect, and the securities as binding as for the respective amounts thereof, as if they were sold at their par value."

In argument and in briefs, the history of this section is developed in careful detail and much time and space has been given to its construction. This section has received some consideration in the federal courts of this jurisdiction, in Toledo, St. Louis & Kansas City Railway Co. v. Continental Trust Co., 95 Fed. 497, 36 C. C. A. 155; the same case at an earlier hearing also reported in (C. C.) 86 Fed. 929; and Continental Trust Co. v. Toledo, St. Louis & Kansas City Railway Co. (C. C.) 82 Fed. 642, pages 658 and 659; Metropolitan Trust Co. v. Columbus, Sandusky & Hocking Railroad Co. (C. C.) 93 Fed. 702; Metropolitan Trust Co. v. Railroad Equipment Co., 108 Fed. 913, 48 C. C. A. 135.

From an examination of these authorities, and of the other cases cited by counsel, I reach the conclusion that section 3290 of the Ohio Statutes is a limitation upon corporate power, in reference to the amount to which bonds can be issued, and, giving the statute all of the force to which it is entitled, it plainly provides that 75 per cent. is the minimum at which bonds can be sold or pledged, and, under the peculiar facts and equities of this case, the bonds in excess of the 75 per cent. limit are not legally pledged, and the pledging of bonds is only valid to the par value of $10,133,333.33.

Inasmuch as a priority is claimed by the receivers of the Wabash-Pittsburgh Terminal, by the Mercantile Trust Company, and the Equitable Trust Company, which is based largely upon the pledging or mortgaging of the traffic and trackage contracts, the effect of these contracts requires consideration at this time.

[3] The orginal traffic and trackage contract of October 10, 1902, which provides for an interchange of freight traffic on joint tariffs, for joint train service and reciprocal trackage rights, and the supplemental traffic and trackage contract of May 10, 1904, created no lien upon the property or earnings of the Wheeling, but were merely personal obligations. An examination of the authorities clearly establishes this proposition. It is unnecessary to discuss all of the objections raised to the validity and fairness of these contracts. I am not impressed with the arguments that these objections to these contracts come too late, by reason of either laches or the bar of the Ohio statute of limitations. The delay or nonaction of the receiver did not operate to the damage of anyone, nor did it induce anyone to change his or its position. The statute of limitations, in view of the existing equitable nature of these proceedings, has no application.

[4] It is quite plain that the provisions of the original traffic and trackage contract were not advantageous to the Wheeling, but, on the contrary, it was inequitable and unfair to this company, and this is shown by the provisions regarding the arbitrary charges to be made and the division of the sums derived from the freight rates. Also the control of the situation under this contract, as clearly appears from a mere reading of the contract.

The supplemental contract only extended the original contract from a 20-year to a 50-year period, and provided for the payment to the

Terminal of an amount not to exceed 25 per cent. of the gross revenue derived from the interchanged freight. This 25 per cent. payment has not been justified in the record by any consideration of railroad practice or of fair dealing. Without going into detail, or giving any special consideration to section 8984 of the General Code of Ohio (formerly section 3369 of the Ohio Revised Statutes), it is sufficient to say that all of the proceedings whereby these contracts were authorized and adopted by the Wheeling directors and stockholders lacked the statutory exactness and solemnity which should characterize proceedings of this important nature.

It follows quite naturally from a careful consideration of the evidence that these contracts were never executed for the benefit of the Wheeling.

[5] In the ambitious effort to perfect a railroad system, the gentlemen interested in the Wabash and in the Pittsburgh-Toledo Syndicate for some reason or other gave little or no attention to the rights of the Wheeling. The trustees of the Terminal mortgages have no greater rights than the Terminal to the benefits under these contracts, and a contrary doctrine cannot be, and I am convinced was not, seriously urged. Both of these contracts were for the main purpose of affording aid to the Terminal, and in entering into these contracts the provisions of section 3300 of the Revised Statutes of Ohio were not followed. All of these informalities in the execution of these contracts add to the impression that they were unfair and unjust to the Wheeling, and accordingly they will be set aside and canceled, as prayed for in the cross-bill of the receiver.

Concerning the 51 per cent. of the stock of the Wheeling, owned by the Terminal, I cannot see that any rights of the Terminal or the trust companies under the Terminal mortgages, were in any way destroyed, or prejudiced by the general mortgage. In voting the 51 per cent. of stock for the general mortgage, the pressing need of the Wheeling must be considered, and, as I have earlier indicated in this memorandum, the execution of this mortgage loan and trust agreement, involving the $8,000,000 note transaction, was essential to the welfare and existence of the Wheeling. The provisions of the Terminal mortgages are not such as to prevent the Terminal Company voting its Wheeling stock in favor of the Wheeling general mortgage.

The relief asked for by the receivers of the Terminal, the Mercantile Trust Company, and the Equitable Trust Company, relating to the priority of the rights asserted in their respective bills, must be denied.

After considering the objections raised to the note issue, the trust agreement, the issuance of the $12,000,000 bonds, the execution of the general mortgage, and the pledging of the notes, I am of the opinion that the contentions of the New York Trust Company and the Central Trust Company are well made, and inasmuch as these parties in urging the validity of these notes and the bonds and this mortgage expressed their willingness that a lien upon the railroad property for the amount of their notes, with interest, will afford the relief they ask for, the final order or decree in providing for a foreclosure can take care of the situation in so far as the notes and bonds are con-

cerned by providing that only so much of the bonds shall be sold, or only so much of the lien shall be asserted, as will insure the payment of the amount of the notes with interest.

[6] The receiver of the Wheeling in his cross-bill asks that the traffic and trackage contracts be declared void, and canceled, and for other relief in reference to these contracts including a prayer that an accounting be had for all sums paid by the Wheeling and for all losses and damages accruing to the Wheeling by reason of the operation of these contracts. These damages or losses are claimed under several different classes. It is asked that an accounting be had for the gains prevented as well as the losses sustained. The alleged losses and gains prevented are based largely on the testimony of Mr. Worthington, a railroad operator of the highest reputation and experience, and also on the testimony of various railroad accountants and experts. The damages claimed involve losses in actual operation, and damages arising from the fact that the Wheeling diverted its cars, engines, and shipping facilities to the Wabash instead of to its own more profitable business. These claims of damages consist specifically of the three items: Amounts paid in cash, and notes to the Terminal on account of the 25 per cent. gross revenue provision in the supplemental contract.

Counsel for the Wabash admit that under this contract the sum of $660,672.72 accrued; that the amount actually paid was $578,198.69, leaving $84,274.10 unpaid; and that $300,000 of the $578,198.69 was paid by a $300,000 note given by the Wheeling to the Terminal and later indorsed by the Terminal to the Wabash, and now held by the receivers of the Wabash.

Second. Losses in actual operation under the contracts.

Under this head, it is claimed that the receipts of the interchanged traffic was the amount less than the cost of performing the service, amounting to $736,163.40, also damages arising from the handling of unprofitable terminal traffic in place of tonnage originating on the Wheeling lines, amounting in all under the operation of the traffic and trackage contracts to $1,751,541.52.

Aside from the amounts paid under the 25 per cent. guaranty, I am unable to say that the balance of the damages claimed are reasonably certain. Furthermore, from the very nature of the transaction, the damages are not capable of that degree of ascertainment which the law requires. The figures from which these damages are claimed and the source from which their origin is traced have been discussed in argument and in the briefs with the greatest possible care and analysis; but, in view of their uncertain and speculative character, the damages being of such a nature that fair men, in their judgment, could not say that they resulted from the operations complained of, it would be unjust to assess them when they are so doubtful. The receiver of the Wheeling also asks that he may be permitted to set up the sums found due the Wheeling as against: First, the $300,000 note, dated May 20, 1907, given to the Terminal in payment of the 25 per cent. guaranty; second, the claim of the Wabash filed against the Wheeling for rentals, ties, and so forth, amounting to a sum greater than $500,000;

third, all other sums for which claims have been filed against the Wheeling by the Terminal Company for sums due under the supplemental contract; fourth, all claims against the Wheeling by the Terminal and its subsidiaries; fifth, the $8,000,000 of notes.

The new equity rules recently promulgated by the Supreme Court in simplifying procedure in equity recognized the doctrine of equitable set-off, where the claim set off is in the nature of a counterclaim, arising out of the same transaction. This doctrine is also well recognized by the federal decisions cited by counsel.

On this branch of the case, the claim of the receiver for the amount paid under the 25 per cent. guaranty clause of the supplemental contract will be allowed and this can be set off as against the $300,000 note and the other items mentioned, with the exception of the $8,000,000 note issue. No set-off can be asserted as against this item.

Carpenter et al. prosecuted an independent suit against the receiver, and obtained a favorable decree. They ask in this suit that the order of the court in the independent suit finding the prior lien bonds in the sum of $200,000 a valid obligation of the Wheeling be carried out by the receiver in preference to all other claims except the receiver's certificates. They also ask that the 4 per cent. bonds discussed and described in the decree in the former suit be declared to have a priority over the $8,000,000 three-year note issue in this case. I am of the opinion that the $200,000 prior lien obligations are not entitled to any priority of payment, after having considered all of the evidence carefully.

It is only fair to all parties to this record that this claim should be paid the same as the claims of any general creditor of the Wheeling. This observation applies with equal force to the contention made by Carpenter et al. on behalf of the 4 per cent. mortgage bonds of the Pittsburgh-Wheeling & Lake Erie Railroad Company, should it be necessary to assert them as a claim against the Wheeling. Carpenter and his associates also assert an alleged unlawful diversion of the funds of the coal company for taxes and improvements. This claim is not supported by competent evidence, and the items embraced in this claim must be disallowed as a claim against the Wheeling or its receiver.

In addition to the issues raised by the pleadings which have been under consideration, there are various claims pending before a special master which can be disposed of and made an element of a final decree.

Considering the entire record, it is quite apparent that the regretable situation resulting in the insolvency of these three railroad companies had its inception in the ambitious minds of the originators of the syndicate, who, in hope of material personal gain, considered corporate entities as mere forms to be used for their own advancement. It also appears that, as the syndicate plans progressed, the Wabash was selected as the dominant corporation; the Terminal owned by the Wabash as the corporation to be aided and assisted, and the Wheeling as the giver of aid and the link of mutual benefit to the two other companies.

211 F.—34

Regardless of the corporate domination of the Wabash, the Wabash as a corporation had the knowledge and did the things which as a corporation made it responsible for the results of its transactions. There was such real domination by the Wabash as the law contemplates. This is apparent from the various contracts made between these companies, the management of these companies, and the operation of the railroad business of the respective companies.

In view of the many issues presented, it is not practicable to indicate in this memorandum an exact form of decree which should be entered. Counsel may prepare a draft of a decree containing the conclusions indicated and submit it for consideration.

It should not be forgotten that the Wheeling property is a valuable one, and that every effort should be exhausted to secure a decree which will best conserve the interests of all concerned.

In the formal preparation of the decree, the prayers of the various bills and cross-bills can be referred to, and provisions inserted in the decree which will provide for a disposition of the various issues raised in the manner indicated in this memorandum.