## LEVY et al. v. EQUITABLE TRUST CO. OF NEW YORK et al.

(Circuit Court of Appeals, Eighth Circuit. February 28, 1921.)

No. 5763.

1. **Corporations ⬯209—Intervention by stockholders on ground of fraudulent failure to defend held barred by laches.**

   Stockholders in a railroad company, which by its act of incorporation had assumed the obligation of its predecessor to guarantee the bonds of another railroad company, are barred by their laches from asking leave to intervene in a suit to sell the railroad property and present the defense of fraud in that agreement to a judgment based thereon in another district, where it appeared that court proceedings against the two railroad companies on the guaranteed bonds had been pending for five years.

2. **Railroads ⬯141—Interlocking directorates of noncompeting lines not fraudulent.**

   The fact that railroad companies, which were noncompeting, but were connecting lines, had interlocking directorates, is not fraudulent.

3. **Judgment ⬯701—Against corporation concludes stockholders' defenses not fraudulently suppressed.**

   A judgment against a corporation is conclusive against its stockholders, who were represented by it, unless it was obtained by fraudulent collusion between the creditor and the officers or directors of the corporation to suppress defenses which the corporation might have asserted.

4. **Corporations ⬯211 (6)—Intervening petition by stockholders to prevent sale under judgment must raise serious question of fraudulent failure to defend suit against corporation.**

   A petition by stockholders to intervene and prevent the sale of corporate property in satisfaction of a judgment claimed to have been obtained by fraud in not defending the suit against the corporation, though it need not make a showing of fraud as fully and definitely as at the trial of intervention, must disclose enough fraud to challenge the serious attention of the court.

5. **Corporations ⬯212—Stockholders held not to have shown fraudulent failure to defend suit against corporation, so as to entitle them to intervene.**

   Where it appeared that the defense of an action against a corporation on its guaranty of the bonds of another was conducted by able independent counsel not connected with either corporation, and that every possible defense was presented in the trial court and on appeal to the Circuit Court of Appeals, except the claimed defense of fraudulent collusion in the guaranty, stockholders have failed to make a sufficient showing to entitle them to intervene and defend on the ground that the judgment of the corporation was procured by fraudulent collusion.

Appeal from the District Court of the United States for the District of Colorado; Walter H. Sanborn and Robert E. Lewis, Judges.

Suit by the Equitable Trust Company of New York, as substituted plaintiff, against the Denver & Rio Grande Railroad Company, in which a receiver was appointed for the defendant company. Petition by Jefferson M. Levy and others, stockholders of the defendant company, for leave to intervene and have the receiver's sale postponed

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

271 F.—4

until the stockholders could present a defense to the judgment on which the order for sale was based was denied (269 Fed. 987), and petitioners appeal. Affirmed.

John Lee Webster, of Omaha, Neb. (Arthur M. Wickwire, Louis Marshall, and Daniel W. Blumenthal, all of New York City, on the brief), for appellants.

George Welwood Murray and John F. Bowie, both of New York City (Franklin W. M. Cutcheon and William Roberts, both of New York City, on the brief), for appellee Equitable Trust Co. of New York.

Before HOOK, Circuit Judge, and COTTERAL and JOHNSON, District Judges.

HOOK, Circuit Judge. This is an appeal by some individual stockholders of the Denver & Rio Grande Railroad Company and a protective committee of like stockholders from an order of the United States District Court for the District of Colorado denying them leave to intervene in the suit of the Equitable Trust Company of New York pending in that court. A decree had been entered in the suit for the sale of the equity of the Denver Company in its railroad properties and the sale was about to be made. The decree was based on a money judgment in the court below for $36,515,038.68, obtained January 7, 1918, by the Trust Company against the Denver Company, which in turn was upon a prior judgment in the United States District Court for the Southern District of New York, upon which a credit had been applied by the sale of property.

The object of the intervention sought by the petitioning stockholders was the postponement of the sale in Colorado to enable them to investigate and develop a defense against the New York judgment and a fraudulent omission to assert it there. As the court in New York had jurisdiction of the parties and of the subject-matter of the litigation, and the judgment against the Denver Company had become final, and judgment on that judgment had also been rendered in Colorado, it was incumbent on the petitioning stockholders to show that they acted seasonably in view of the circumstances, that their corporation had a good defense to the demand of the Trust Company, and that through fraud the defense was not presented in New York.

Upon a hearing of the petition and proofs the court below held that the petitioners either knew or should have known, long before the New York judgment was rendered, of the transactions upon which it was founded and of the defenses that might be urged, and that their inactivity amounted to such neglect or laches as precluded them from asserting, at this time, a defense not made by their corporation, the defendant in the cause. Passing this objection, the court below further held that the petitioners failed to show the probable existence of a sufficient defense that might have been, but was not, set up in the New York case, or fraud on the part of counsel who had charge for the Denver Company in that court. The petition to intervene was therefore denied. A sale of the railroad properties of the Denver Company not previously sold under proceedings in other courts was then had;

but, pending this appeal from the denial of the intervention, action on the motion for confirmation of the sale was deferred by the court below.

The present case is the culmination of events that began in 1905 and is the direct outgrowth of various judicial proceedings first in the Ninth Circuit, then in the Second Circuit, and finally in the United States District Court for Colorado, from which the appeal to this court comes. In both the Ninth and the Second Circuits they reached the Circuit Courts of Appeals. An unsuccessful effort was also made to obtain a review by the Supreme Court of the judgment in the Second Circuit. What has occurred makes a long history, but only so much of it will be set forth here as is needful to disclose the situation when the stockholders asked to intervene in Colorado on November 1, 1920. It appears in greater detail in 231 Fed. 478; 145 C. C. A. 457, 231 Fed. 571; 233 Fed. 335; 236 Fed. 814; 244 Fed. 485; 162 C. C. A. 397, 250 Fed. 327; 246 U. S. 672, 38 Sup. Ct. 423, 62 L. Ed. 932.

Prior to 1905 the Western Pacific Railway Company, a corporation organized under the laws of California, had acquired a right of way from Salt Lake City to San Francisco and had constructed a small amount of track. The Denver & Rio Grande Railroad Company, a Colorado corporation, and the Rio Grande Western Railway Company, a corporation of Colorado and Utah (then practically, but not legally, a single company, with a single system of railroads), greatly desired the completion of the Western Pacific, so that they would have an outlet to the Pacific Coast. Reasons for this are recited in the above-reported cases, and are also referred to in the opinion of the Supreme Court in United States v. Union Pacific R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124. Briefly, as stated, they were to avoid being bottled up by the combinations, effected and threatened, of other large transcontinental systems to the north and south of them, and competing with them and their Eastern connections for the same through traffic. The building of the railroad from Salt Lake City, where it connected with the Rio Grande Western, to San Francisco, required a large amount of money, and that in turn required the issue and sale of Western Pacific securities that would appeal to the purchasing public; and so it was arranged that the Denver and the Rio Grande Companies should back the Western Pacific project with their own credit.

The transaction took the following form: The Western Pacific completed the issue, previously authorized, of $50,000,000 of its first mortgage 5 per cent. bonds due September 1, 1933. On June 23, 1905, it executed to a trust company, as trustee for the bondholders, its first mortgage on its railroad then and thereafter constructed. On the same day it executed, with others, three contracts, known as A, B, and C. In this case we are mainly concerned with contract B, in which the Denver & Rio Grande and the Rio Grande Western were parties of the first part, the Western Pacific the party of the second part, and the trust company, as trustee, the party of the third part. It may be observed here that this contract was included in the mortgage of the Western Pacific to the trust company as a pledged or mortgaged

item along with the railroad properties; also that the mortgage and the three contracts, A, B, and C, were parts of one and the same comprehensive transaction. In 1908 the Denver & Rio Grande and the Rio Grande Western were consolidated in the name of the former under the laws of Colorado and Utah; the consolidated company expressly assuming the obligations of its constituents under contract B. For convenience the constituent and consolidated companies will be generally referred to as the "Denver," except where necessary to distinguish them. The trust company, as trustee in the mortgage of the Western Pacific and third party in contract B, was succeeded in title and trust by the Equitable Trust Company of New York, a party to the cause here, and they will be referred to as the "Trust Company."

To return to contract B: Reduced to its lowest terms, material on this appeal, the contract provided: (a) That the Denver should have certain defined traffic and trackage rights in respect of the railroads of the Western Pacific; (b) that the Denver should generally keep the Western Pacific going financially, and, specifically, should pay to the Trust Company for the bondholders all interest on the Western Pacific first mortgage bonds, not actually paid by the Western Pacific, until all the bonds were fully paid principal and interest; (c) that the contract should run with the railroads of the Denver and the Western Pacific into whosesoever hands they might come, and that its provisions and the performance of them should be deemed a part of the consideration of any contract, of whatever form or nature, and of any transaction by which any person or corporation might acquire or attempt to acquire the railroads or either of them; (d) that if, upon default in any of the terms of the Western Pacific mortgage a right of foreclosure should accrue to the Trust Company, it might terminate the contract, and all provisions giving the Denver the right to the use and possession of the railroad of the Western Pacific, excepting provisions that the Denver should pay interest on the bonds as above.

The Denver paid interest on the Western Pacific bonds until, finding that its own solvency was seriously threatened, it defaulted in the semiannual installment due March 1, 1915. Its failure to pay at that time was according to a prior declaration that it would pay no more. March 2, 1915, the Trust Company brought suit in the Northern district of California to foreclose the mortgage. Receivers were appointed, and they took possession of the Western Pacific Railroad. While the suit was pending, further default was made as to the interest due September 1, 1915, and on December 18, 1915, the Trust Company declared the principal of the bonds due. On May 26, 1915, the Trust Company filed an ancillary bill in the Southern district of New York and the court there appointed as receivers of the Western Pacific property in its jurisdiction the same persons who had been appointed in California. On the following day, May 27, 1915, the Trust Company filed in the court in New York a suit against both the Denver and the Western Pacific, setting up the mortgage and contract B, and asking for a construction of the latter in respect of the obligations of the Denver under its terms, the determination of the amount due on the Western Pacific bonds after the foreclosure in California, a receiver of the

Denver, and the subjection of its property to its ascertained liability under the contract.

On February 21, 1916, the court in California enjoined the Trust Company, then before it as complainant in the mortgage foreclosure suit, from prosecuting the suit against the Denver in New York. It held that the mortgage and the three contracts were parts of one transaction, and that the rights of the Trust Company were not independent, but were so qualified by the reciprocal covenants between it and the railroad companies and between the railroad companies themselves that the foreclosure suit of which it had jurisdiction involved the rights of the Trust Company under contract B; also that this applied as well to contract A to which the Trust Company was likewise a party and to contract C to which the Missouri Pacific Railway Company (the Eastern connection of the Denver) was a party. The court in California thereupon ordered that the Denver and the Missouri Pacific be made parties to the foreclosure suit there. 231 Fed. 478. On appeal by the Trust Company (and writ of prohibition) the Ninth Circuit Court of Appeals on March 29, 1916, reversed the order of the District Court. It held that the covenant of the Denver to pay the Trust Company the interest on the Western Pacific bonds was independent and severable from the other covenants in the contracts, and was not involved in the foreclosure suit, nor judiciable there, except at the instance of the Trust Company with personal jurisdiction of the Denver. 145 C. C. A. 457, 231 Fed. 571.

The suit for foreclosure of the Western Pacific mortgage then proceeded in the court in California without involving the rights and liabilities under contract B. A decree was rendered May 27, 1916, for the full amount of the Western Pacific bonds with interest and for foreclosure. The court, in determining the terms of sale, fixed the minimum or upset price at $18,000,000. This amount was upon a consideration of the then earning capacity of the railroad and the value of the unproductive properties. 233 Fed. 335. The properties, including contract B, were bid in at the upset price by representatives of the holders of about 95 per cent. of the Western Pacific bonds and conveyed to a new company organized by them. In December, 1916, the bondholders' new company filed in the foreclosure suit a written election not to assume or adopt contract B, and stating that it did not as purchaser of the railroad claim "the right to assert, enforce, and enjoy any right formerly in the property of the Pacific Company (old Western Pacific) in said contract B."

On June 14, 1917, the District Court for the Southern District of New York in the suit pending there rendered a decree in favor of the Trust Company against the Denver for $38,270,343.17. This was the deficiency after the California foreclosure plus interest. In reaching that conclusion the court in New York held, May 17, 1917, that the liability of the Denver under contract B in respect of the interest on the Western Pacific bonds was unconditional, that it survived the foreclosure of the mortgage in California and the disavowal of contract B by the bondholders' new company, that the Trust Company had a right to declare the principal of the Western Pacific bonds due under the

terms of the mortgage, that the making of contract B was within the statutory powers of the Denver and not ultra vires, that the undertakings of the Denver to the Trust Company under contract B were independent of and severable from the other stipulations in that and the other contracts and the mortgage, that the action of the Trust Company in securing the fixing of the minimum upset price and the purchase by the bondholders for such price at the foreclosure sale of the Western Pacific Railroad in California did not release the Denver from further liability to the Trust Company, and that its then liability according to actuarial rules was at least equal to the unsatisfied principal of the bonds and accrued interest. 244 Fed. 485. We have recited these principal items of the court's decision to indicate the defenses that were made by the Denver. The Denver appealed from the decree to the Circuit Court of Appeals for the Second Circuit. On execution certain Liberty bonds of the Denver were sold and the proceeds, $3,-003,562.52, were applied on the decree.

On December 27, 1917, the Trust Company brought an action on the decree just mentioned in a state court of New York with attachment of assets of the Denver in that jurisdiction. It obtained judgment there on March 13, 1918, and moneys, stocks, and bonds taken on execution resulted in credits aggregating $5,632,064.28. Shortly afterwards the Trust Company obtained another judgment on the New York decree in a state court of Cook county, Ill., and moneys of the Denver taken on attachment produced a further credit of $967,301.37. On January 3, 1918, on the appeal by the Denver from the decree of the District Court for the Southern District of New York to the Circuit Court of Appeals for the Second Circuit, the cause was remanded, with direction to transfer it from the equity side to the law side of that court, and as so transferred the decree or judgment was affirmed. 250 Fed. 327, 162 C. C. A. 397. As already observed, the effort of the Denver to obtain a review by the Supreme Court failed April 15, 1918. 246 U. S. 672, 38 Sup. Ct. 423, 62 L. Ed. 932.

On August 23, 1917, prior to the proceedings in the state courts, the Trust Company brought an action in the court below, the United States District Court for Colorado, on the decree of the federal court in New York and on January 17, 1918, obtained judgment against the Denver for $36,515,038.68, the amount of the New York decree and interest, less proceeds there of the sale of the Liberty bonds. On January 17, 1918, a creditor of the Denver brought a suit in equity in the court below for the administration of its assets and the appointment of a receiver. The Trust Company intervened on January 25, 1918, and receivers of the Denver were appointed. On December 22, 1919, the Trust Company was substituted as plaintiff in the cause. The railroad was in the possession of and was operated by the Director General of Railroads during the period of federal control. By a decree in the equity cause, dated September 25, 1920, the court below found the amount due on the New York decree of June 14, 1917, also that the balance due on the judgment rendered by it January 7, 1918, on the New York decree after charging the Trust Company with all moneys received through proceedings in other courts and otherwise was $36,-

192,655.78, and that the Denver was insolvent. The decree directed the sale by a master of all the Denver railroads and properties not theretofore disposed of (except a claim against the United States arising from federal control) subject to the lien of the mortgages. The decree was filed October 1, 1920, and the master advertised a sale for November 20, 1920.

[1] After all the above had occurred with such publicity as usually attends important matters of that kind, the petitioning stockholders asked the court below to stay further proceedings to enable them to investigate and assert a defense of fraud to the New York judgment not made by their corporation; and the essential elements of the fraud they assert consist of matters of long standing, not secret or concealed at the time, but of public notoriety or report, part in recitals in the records of their railroad company kept as required by law, of which they were bound to take notice, and part of known corporate history shown in financial and statistical publications in current and common use. The very corporate structure of the consolidated Denver, in which the petitioners hold their stock, discloses (1908) an express assumption of the obligations of contract B which they now assail. They knew or should have known that the litigation in California and New York against the Western Pacific (1915–1916) might affect seriously their interests in the Denver. But, whether so or not, the suit of the Trust Company against the Denver in the Southern district of New York (1915–1917) was at once a warning of what might follow. The Trust Company sought in that suit the subjection of the property of the Denver to its liability under contract B and so stated in its initial pleading. The case was pending in that court for two years before final judgment was rendered, and the Denver corporation was allowed to defend it without action or participation upon the record by the stockholders.

These and many other proceedings and transactions within the five years prior to their petition to intervene, of which they knew or could have known, and therefore must in law have known, constitute an obstacle to the relief now sought which the court below had no power to remove. Leavenworth Commissioners v. Railway, 134 U. S. 688, 10 Sup. Ct. 708, 33 L. Ed. 1064; Foster v. Railroad, 146 U. S. 88, 13 Sup. Ct. 28, 36 L. Ed. 899. It may be that the inactivity of the petitioners was due to a belief that in some way an adjustment would be made preserving from extinction their equity in their railroad. That is usually done when the interests involved are so great that there is practically no protection against a strict insistence upon contractual obligations, especially in times of temporary depression; but whether it should be followed or not is a question of broad policy, solely for the creditor, not for the court. The court below was judicially required to recognize the judgment that had been obtained in New York and to grant the process demanded. With that its province ended. This is not a proceeding in which the aid of a court of equity has been invoked to facilitate the reorganization of a railroad and an adjustment of its acknowledged obligations in which it might as a condition temper the demands of creditors to time and circumstance and prevent injustice

and oppression. It is essentially an insistence upon the enforcement of a judgment by the process provided by law.

[2] We agree with the court below that, aside from delay of petitioners constituting a clear case of laches, they presented no probability of a meritorious defense of fraud to the demand of the Trust Company. Reliance is placed on Central Trust Co. v. Wheeling & Lake Erie (D. C.) 211 Fed. 515, a foreclosure case in which at the instance of a receiver certain traffic and trackage contracts, having points of resemblance to those here, were involved. The case is not in point; moreover, when it reached the Sixth Circuit Court of Appeals, the decision there was not upon the ground relied on here. Baker v. Central Trust Co., 148 C. C. A. 511, 235 Fed. 17. Emphasis is put upon the existence of interlocking directorates in the Western Pacific, the Denver, and the Missouri Pacific which in combination with other railroads eastward were, it is said, designed to further an ambitious plan for a transcontinental system from Baltimore to San Francisco. But interlocking directorates of railroads, noncompeting actually or potentially, but in the direct line of continuous transportation, are not fraudulent per se or presumptively fraudulent. Many of the large railroad systems of this country grew in that way and are so composed to-day.

With statutory authority the extension of an established railroad system in the name of another corporation organized or acquired for the purpose, with use of the financial credit of the former, and its retention of control of the directory of the new enterprise, is a very common thing in the history of American railroads. Legitimate financial considerations are often the reason, and sometimes legislation itself. It may be said generally that, where the consolidation of connecting, noncompeting railroads is not contrary to public policy, a community of interest in them, with representation accordingly in their directorates, is neither fraudulent per se nor presumptively fraudulent. Of course as long as they maintain their several corporate organizations, contracts between them, when attacked in the courts, will be scrutinized in the light of the common control. But in the case at bar the Western Pacific was essentially an enterprise of the Denver, not very different in the last analysis, had it been with legislative authority directly financed and constructed in the name of and by the Denver itself. That a venture proves ill advised or unfortunate is one thing; that it is fraudulent is quite another.

[3, 4] There is still another obstacle to the granting of the petition. According to familiar principles of law the judgment against the Denver in New York concluded its stockholders as to every defense that was or might have been urged against it, unless those in charge of the case for that company collusively or fraudulently omitted a valid and sufficient defense. That is the legal effect of the judgment against the Denver corporation, and the petitioning stockholders have no independent standing to contest it or to try the case anew except in the circumstance stated—extraneous fraud at the trial in New York. While it was not necessary that petitioners make such a showing as fully and definitely as at the trial of the intervention had one been al-

lowed, yet it was incumbent upon them to disclose enough to challenge the serious attention of the court below.

[5] As regards the condition above mentioned they failed wholly and completely. On the contrary, it appears that the case for the Denver in the court in New York and on appeal to the Circuit Court of Appeals was in charge of independent counsel of great ability and reputation, not affected by the influences alleged to have controlled the prior corporate actions of the Denver. The reported opinions of those courts show that almost every conceivable defense to the demand of the Trust Company was urged, other than that now asserted by the petitioners, the proof as to which we have already considered. There was hardly a suggestion at the hearing below that the counsel was not able and faithful. We have recited the principal features of the opinion of one of those courts. The most interesting question raised, if not the most substantial one, was that of the power of the Denver under the statutes of Colorado and Utah to contract as it did, in view of the construction given to contract B and the disavowal of the contract by the bondholders who bought in the Western Pacific at the foreclosure in California and for whom the Trust Company stands. In other words it was whether, since the state statutes, one expressly and the other impliedly, required a consideration for such engagements as the Denver undertook on behalf of the Western Pacific, the promises of the former to the Trust Company were wholly independent of the other stipulations in that and the associated instruments in which, it was contended, the considerations and their continuous noncommutable character resided. Upon full consideration the question was decided against the Denver and is concluded by the judgment. Finally, it may be observed that a previous committee of stockholders of the Denver was formed in 1917, and continued until about the time the present one came into being in October 1920; but what, if anything, it did in connection with the litigation does not appear.

The order denying the petition to intervene is affirmed.