EQUITABLE TRUST CO. OF NEW YORK v. DENVER & R. G. R. CO.

SAME v. WESTERN PAC. RY. CO.

(Circuit Court of Appeals, Second Circuit. January 3, 1918.)

No. 99.

1. RAILROADS ⬪154—CONTRACTS—CONSTRUCTION.

A contract in which two railroad companies (afterward becoming by merger the defendant company which assumed their liabilities) were parties of the first part, another railroad company controlled by them party of the second part, and the trustee in a mortgage executed by the latter as part of the same transaction party of the third part, construed, and held to amount to an unconditional guaranty by the first parties of payment of the interest on the mortgage bonds of the second party.

2. RAILROADS ⬪154—CONTRACTS—CONSTRUCTION AND OPERATION.

The foreclosure of the mortgage by the trustee under its terms, the sale of the property, and the repudiation by the purchaser of other provisions of the contract, held to have been fully anticipated and provided for therein; it being expressly provided that none of those things should affect the liability of defendant, and not to discharge defendant from liability for interest except to the extent that the bonds were paid from the proceeds of the foreclosure.

3. RAILROADS ⬪18—CONTRACTS—VALIDITY—ULTRA VIRES.

Under the settled rule that a corporation may, within the boundaries of legal action, make any contract for its corporate benefit upon proper consideration and that the lawful end to be obtained may be the test of legal power, a railroad company having statutory authority to purchase the obligations of another company may, when it owns the controlling interest in such company and its continued maintenance and operation is for its own benefit, lawfully contract to buy the notes of the subsidiary company at stated intervals through a series of years in such amounts as may be required to make up the amount necessary to pay the accruing interest on the subsidiary company's bonds until such bonds shall be paid, and it is not discharged from such obligation, made directly to the trustee for the bondholders, by the subsequent insolvency of the subsidiary company.

4. RAILROADS ⬪154—GUARANTY—BREACH—MEASURE OF DAMAGES.

Where a railroad company entered into a binding contract with the trustee for the bondholders of another company to furnish sufficient mon-

---

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ey to insure payment of the interest on the bonds until they should be paid, independently of the mortgage securing the same, its action in publicly declaring that it would no longer continue to observe such contract and refusing to pay coupons on their maturity was a repudiation of the contract which entitled the trustee to recover for a total breach, and the measure of damages was the present value of the continuing obligation, limited to the principal of the debt, diminished by a partial payment realized from foreclosure of the mortgage.

5. APPEAL AND ERROR ⊜⇒1149—CORRECTION OF ERRORS—TRANSFER OF CAUSE TO LAW SIDE.

Where a suit was brought in a federal court as one in equity and tried as such without objection but no ground of equitable jurisdiction was established by the proofs and the result was a money judgment for breach of contract, the appellate court has power to, and should, under Equity Rule 22 (198 Fed. xxiv, 115 C. C. A. xxiv), order the cause transferred to the law side of the court and the judgment made to conform to legal procedure by the vacation of any injunction issued in the cause.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Equitable Trust Company of New York, as trustee, against the Western Pacific Railway Company, with ancillary dependent suit against the Denver & Rio Grande Railroad Company. Decree for complainant in the latter suit, from which defendant appeals. Remanded for correction, and affirmed.

For opinion below, see 244 Fed. 485.

Appeal from a decree in equity entered in the above-entitled "ancillary dependent" action in the District Court for the Southern District of New York.

The trial of this case in the court below consisted in submitting to the District Judge several volumes of documents and some written stipulations as to facts. No oral testimony was taken, and, in the sense of what words were spoken or written or when certain acts took place, the record presents no conflict of evidence. The differences between the parties are wholly as to the proper inferences to be drawn from the documents aforesaid.

The following nomenclature has been pursued throughout the litigation and will be adopted by this court:

The Equitable Trust Company is a corporation of New York and the trustee acting under a certain indenture of mortgage made by the Western Pacific Railway Company to secure an issue of its first mortgage bonds to the amount (par) of $50,000,000. The trust company will be referred to as the "trustee," and the mortgage as the "Pacific mortgage."

There was a Denver & Rio Grande Railroad Company incorporated under the laws of Colorado in 1886, which will be referred to as the "old Denver Company"; while the present defendant-appellant of the same name was incorporated in 1908 under the laws of Colorado and Utah and will be spoken of as the "new Denver Company." This last corporation was and is a consolidation of the old Denver Company and the Rio Grande Western Railway Company which was organized in 1889 under the laws of Colorado and Utah, and will be referred to as the "Western Company." From a time anterior to any of the matters raised in this litigation the old Denver owned and operated a railway from points in or not far from Denver to (or nearly to) the Utah boundary, while the Western Company owned a railway from (or substantially from) the terminus of the old Denver to Ogden. These two connecting or continuous lines of rail were operated as one system under the control and direction both as to traffic and finance of the old Denver Company.

The Western Pacific Railway Company is a corporation under the laws of California, chartered in 1903, and at that time (or thereabouts) authorized to

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

construct and operate a railway from Ogden to San Francisco. It will be spoken of hereinafter as the "Pacific Company," and was the maker of the first mortgage aforesaid.

It is so clear that no reference will hereafter be made to the evidence proving that the Pacific Company was intended to be and was the creature of the Old Denver and its successor the New Denver, and that the purpose of its creation was to afford to the Denver Company (whether new or old) an outlet or through line to the Pacific Coast in order that the Denver Companies might be independent of the other and pre-existing lines of railway between Utah and the Pacific Coast upon which transportation companies it had previously been necessary to depend for obtaining and retaining through freight.

The method of this control (existing from the day of the Pacific Company's incorporation until after the beginning of this suit) need not be specified. It is enough to state that the Pacific Company could take no corporate action except through men who held their places by the legally exercised authority of the men (often the same) who controlled the Denver Companies (new or old according to time of action).

In 1905 the Pacific Company (thus controlled) was a railroad mostly on paper, and desired to build its line by the usual method of raising money on the mortgage of that which was to be built.

To effect this it was necessary to find bankers who could and would (at a price) sell the mortgage bonds to the public. Such bankers were found, with whom was executed a document by the Pacific Company only, wherein and whereby that company promised that, if they would act as a syndicate for the purchase and distribution of the bonds, the Old Denver and Western Companies would enter into certain agreements calculated to increase the attractiveness and security thereof. This document has been referred to throughout the record as the "bankers' agreement." This was followed by a formal ("preliminary") contract between the Old Denver and the Western as parties of the first part and the Pacific Company as party of the second part, whereby the first parties substantially agreed to do what the Pacific Company had (with the bankers) agreed would be done.

Immediately thereafter, the trustee having been selected for the projected mortgage, a document was executed called in this record "Contract B," wherein the Old Denver and Western Companies were of the first part, the Pacific Company of the second, and the trustee of the third. It is out of this agreement that the rights of the plaintiff in this action arose. In and by it all preceding negotiations or written arrangements were merged, or superseded, and references to the bankers' and preliminary agreements are unnecessary except as they throw light upon the meaning of the words or phrases used in contract B—provided that such words, etc., are of ambiguous or uncertain meaning. We discover no uncertainty or lack of clearness in contract B, requiring reference to the tentative or preliminary writings aforesaid.

Immediately on the execution of contract B (though nearly two years antedated) and on June 23, 1905, the Pacific mortgage was executed and delivered. The bonds thereby authorized were issued and through the bankers widely sold. Semiannual interest upon them (due in March and September) was regularly paid, to and including September 1, 1914. The Pacific Company never earned that interest in full, and its construction far exceeded the estimate on the faith of which the enterprise had been undertaken and which the bond sales would have nearly covered. Both excess construction cost and interest moneys were furnished by the Old Denver and Western until 1908, and after that by the present defendant.

When the interest of September 1, 1914, was about to be paid, the New Denver authorized a public statement (by resolution of its directors) that if it was "to continue its support of (Pacific Company) some plan of readjustment of that company's finances and the relation of the (New Denver) thereto must be devised." No such readjustment was made, and the Pacific Company having failed to earn enough money over taxes and operating expenses to pay interest due March 1, 1915, the New Denver provided no funds and default ensued. Thereupon and on March 2, 1915, the above-entitled "original suit" of foreclosure was instituted in the District Court for the Northern District of California. Subsequently ancillary aid was requested in the

Southern District of New York, and on May 27, 1915, this "ancillary dependent" action was brought in the court below.

The prosecution hereof was enjoined by the District Court for the Northern District of California, until such injunction was reversed by the Circuit Court of Appeals for the Ninth Circuit. In re Equitable Trust Co., 231 Fed. 571, 145 C. C. A. 457. The trustee thereupon proceeded to a decree of foreclosure against the Pacific Company, sold the road, and on October 11, 1916, the District Court in California fixed the amount produced by the sale applicable to the payment of the principal of the bonds represented by the trustee herein.

Shortly thereafter this ancillary dependent bill was amended so as to set forth fully the cause of action now before this court. The case was tried as one in equity (Learned Hand, D. J.) and a decree entered, the mandatory portion of which is as follows:

"Ordered, adjudged, and decreed as follows: That the complainant, the Equitable Trust Company of New York, as trustee, recover from the defendant the Denver & Rio Grande Railroad Company the sum of $38,270,343.17, with interest thereon at the rate of 6 per cent. per annum from the date of this decree; that the defendant, its officers and agents, pay said sum to the complainant; and that the complainant have execution therefor pursuant to the rules and practice of this court."

From that decree this appeal was taken.

The provisions of the several documents hereinabove referred to may be summarily stated or described as follows, so far as they seem to us relevant in this litigation: It is by these provisions of said documents that the decree above set forth must be justified.

Contract B recites that all the parties thereto "have knowledge of each and all of the provisions of the said first mortgage of the Pacific Company and entered into this agreement in contemplation thereof." It also recites that the "Pacific Company covenants that this agreement shall be in all respects subject to its said first mortgage and to pledge its interest under this agreement under, and to make the benefits to be derived therefrom a part of the security provided by said mortgage, and by so doing it will be enabled" to sell its bonds more advantageously than could be done "if this agreement were not so subordinated and pledged."

It may be noted without further quotation from evidence that in and by the first mortgage such pledge was obtained, so that the trustee became fully entitled to assert in its own name whatever claim or demand contract B created as against any party to that contract, and that the trustee's right so to assert and enforce the true meaning of contract B has not been denied in this litigation.

Contract B in the main may be described as intended to make Pacific Company entirely subordinate to and a feeder of the Old Denver and Western in respect of traffic acquisition and arrangements. But article 2 of the contract contains the following specific joint and several covenants on the part of the Old Denver and Western Companies, viz. (section 4):

"To purchase semiannually, beginning with the date hereof except as otherwise expressly stated, and to pay therefor, dollar for dollar in cash at the dates and in the manner hereinafter provided, promissory notes of the Pacific Company bearing interest at the rate of 5% per annum and payable on demand, to the amount of face value, by which the gross earnings and income of the Pacific Company during the preceding fiscal half year shall be insufficient to meet the sum of the following:

"(1) [Operating expenses.]

"(2) [Taxes and assessments.]

"(3) From and after the first day of September, 1908, or the earlier acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, all interest falling due during the then current calendar half year upon the Pacific Company's [mortgage bonds].

"(4) [Sinking fund.]

"(5) [Any other expense necessary to protect unimpaired the lien and priority of the said Pacific mortgage.]

"(6) [Any tax required or permitted to be paid upon the principal or interest of said mortgage bonds.]

"(7) [Interest for the half year on all indebtedness of the Pacific Company other than said mortgage bonds.]"

Then follow in the same section 4 of article 2 further joint and several covenants of the Old Denver and Western Companies "to pay unto the trustee * * * out of the purchase price of the notes to be purchased by them" as above provided:

(1) Such amount as will, together with the amount actually and lawfully appropriated by the Pacific Company out of its earnings and other income, be sufficient to pay any "semiannual installment of interest."

Then follow similar direct covenants to pay to the trustee deficiencies in sinking fund payments, operating expenses, taxes, etc.

Finally by said section 4 of article 2,·the Old Denver and Western Companies severally waived "any right which they or either of them might otherwise have to demand the delivery of any of the promissory notes to be purchased by them" as above provided, "before or coincidently with the payment by them of the purchase price of any such notes"; but the said companies, on the other hand, agreed to "promptly pay the purchase price of·all notes that they or either of them shall be under obligation to take hereunder at the times and in the manner therein provided, although the Pacific Company shall not at the time of any such payment have ready for delivery or shall not have taken the steps necessary to authorize the delivery of—or for any other reason shall fail to deliver any of such promissory notes; but neither (Old Denver or Western Company) shall be deemed by reason of the making of any payment prior to the receipt of the notes thereby paid for * * * to have waived or otherwise prejudiced" their right to enforce and receive delivery of such notes from Pacific Company.

In article 3, § 5, the Pacific Company specifically covenanted to "apply all of its gross earnings and income" to the same seven above enumerated purposes in respect of which the Old Denver and Western Companies covenanted as above to supply deficiencies in Pacific Company's earnings; and further Pacific Company specifically agreed to put its fiscal agents in funds several days before the coupon days of the mortgage bonds sufficient to pay the interest in March and September, and further promised that said fiscal agents should advise the trustee of the payments so made.

In article 5 of the contract the trustee covenanted to hold all moneys by it received pursuant to the provisions of contract B for the uses and purposes of the Pacific mortgage, i. e., for the benefit of the bondholders; and particularly to take any legal steps that might be necessary either in its own name or that of the Pacific Company to enforce "all the terms and provisions of article 2 hereof that require any payments to be made to the trustee by" Old Denver and Western Companies or either of them.

By article 6, § 10, it was declared that "the refusal, neglect or other failure of the Pacific Company to perform" any of its covenants in the contract "shall not constitute ground for the rescission of or refusal to perform, or delay in performing, this contract" by the Old Denver or Western Company.

By section 11 of the same article it is agreed that if "any of the covenants, agreements or other provisions·in this instrument shall be adjudged void or unenforceable" no other provision shall be thereby affected.

By section 13 of the same article it was agreed that contract B "shall except as hereinafter provided, continue in full force and effect and be binding upon all the parties hereto from the date hereof until all of said [Pacific mortgage bonds] shall be fully paid, principal and interest * * * as provided in [said] mortgage, and shall run with the railways of the said several railway companies parties hereto into whosoever hands the same may come."

By section 14 of the same article it is declared that: "Notwithstanding anything herein contained, or anything contained in said first mortgage of the Pacific Company, neither the obligation of the parties of the first part nor the obligation of either of them to make any of the payments provided for in sections 4 and 5 of article 2 of this agreement as and at the times herein provided, shall be abrogated or in any manner modified until all of the bonds secured by (said Pacific mortgage) shall be fully paid, principal and interest."

But if default is made in payment of principal or interest on the bonds aforesaid or any other default in the covenants or conditions of the mortgage whereby a right of foreclosure accrues, "the trustee shall have and shall forthwith become vested with the right * * * to terminate this agreement save and excepting always the provisions for payments of interest, sinking fund contributions and taxes contained in sections 4 and 5 of article 2 hereof."

By several other forms of words the thought or idea last expressed was set forth, namely, that, notwithstanding default or foreclosure or termination of every other provision or agreement of contract B, sections 4 and 5 of article 2 of the contract should always separately and independently survive as an asset belonging by pledge to the trustee for the benefit of the holders of the obligations created by the Pacific mortgage.

The habendum clause of the Pacific mortgage specifically "bargained, sold, assigned * * * pledged and set over" contract B to the trustee. That mortgage contained quite usual provisions as to defaults by the Pacific Company and the effect thereof. It is not denied that so far as any terms in the mortgage are concerned the trustee had a right to what was done in the foreclosure suit, and declare the entire mortgage matured, obtain a final decree, and sell the property.

On the settlement of the decree in foreclosure prolonged hearings were had as to the upset price of the mortgaged property. It is not denied that the only possible purchaser was the bondholders' committee, and that the only method of paying was (pursuant to the terms of the mortgage) in bonds. The railway had been in the hands of a receiver for some time before sale and accumulated a surplus over taxes and operating expenses.

The final decree fixed the upset price at $18,000,000, though it was proven that (including loss of interest) the mortgaged property had cost about $77,-000,000.

The bondholders, through their committee, purchased at the upset price, paid the expenses of foreclosure and receivership in the main out of the receiver's accumulations aforesaid (which were sold as a portion of the mortgaged property), took a conveyance in the name of a new corporation called Western Pacific Railroad Company of everything that was sold, including contract B, and then in the foreclosure suit in California filed what is called a "written election of purchaser under foreclosure not to assume or adopt certain contracts," in and by which document it declined to assume or adopt (inter alia) contract B, stating that it did not as such purchaser claim "the right to assert, enforce and enjoy any right formerly the property of Pacific Company in said contract B."

The net result of the foreclosure was that each $1,000 Pacific bond was indorsed as paid to the extent of $354.55, remained unpaid as to the balance, and the trustee had, or was entitled to obtain, a deficiency judgment of approximately $32,000,000 against the Pacific Company, which by agreement of all parties became upon foreclosure and still remains a corporation only in name and wholly without property or any hope of obtaining the same.

It may here be noted that shortly after the organization of the New Denver Company that corporation (this defendant) caused to be indorsed upon a large majority of the Pacific bonds a direct and simply worded guaranty of the "punctual payment of the interest upon the within bond." This was done in pursuance of some further dealings with bankers in respect to new issues of Denver securities. The same guaranty would have been stamped upon all of the bonds here in question had request therefor been made.

The nature of the amended and supplemental bill upon which this action rests may now be stated. This pleading was filed by leave of court shortly after the action above noted of the Circuit Court of Appeals in the Ninth Circuit. It was filed January 5, 1917, and sets forth at great length the history of transactions hereinabove summarized, alleges the failure of the New Denver Company to perform "all and singular its promises contained in contract B," and asserts that the defendant by its conduct "totally repudiated its obligations under contract B, and declared that it would no longer or at any time thereafter perform said contract."

Allegation is then made that, while defendant is paying other maturing in-

debtedness, it is "entirely unable to pay the amount rightfully due from it under the terms of contract B by reason of its entire breach thereof," so that, if "its obligations under contract B" be taken as a liability, the defendant is "completely insolvent."

This conduct of defendant is in the bill alleged to be a continued diversion of its income. Statement is then made that defendant has property within the Southern District of New York, wherefore the prayer is made that the court "find and declare the amount due under contract B from the New Denver Company," and that "the court also determine on equitable principles the principal sum required to be paid, or secured to be paid by the said New Denver Company in order adequately to provide for the fulfillment of its covenant for future payments contained in said contract B"; that the amount so declared to be due be also declared "a charge upon the property of the New Denver Company superior in right, lien and equity" to certain other and specified obligations or securities of said defendant; also, that the property of said defendant within the jurisdiction of the court be "sequestrated" and sold in order to satisfy the charge or lien thus prayed for.

Concurrently with the filing of this amended bill, injunction issued restraining the New Denver Company from exercising control over certain funds lying to its credit in the city of New York, and on June 14, 1917, concurrently with the entry of the above-recited final decree herein an injunction order was issued restraining (for a period not yet expired) defendant "from removing from the jurisdiction of" the District Court for the Southern District of New York the funds aforesaid, "provided, however, that nothing contained in this order shall prevent the taking of the said sums of money or either of them by the marshal either under writ of execution issued pursuant to said decree, or under order of this court issued in aid of said writ of execution," unless defendant filed a supersedeas bond, which has never been done.

When in 1905 contract B was executed and the Pacific mortgage created, certain statutes of Colorado and Utah were in force, copies of which are below inserted.[1]

The Old Denver, though it controlled, did not physically connect with the Pacific Company. The Western did so connect, and by other statutes (not quoted) the Old Denver was authorized either to lease or purchase a road occupying the relation to it of the Western Company.

Finally it may be noted that the Pacific Company was made a party defendant in this suit. It was served, appeared, but never answered. Decree and injunction passed against the New Denver only.

---

[1] "It shall be lawful for any railroad company * * * upon good consideration, to guarantee the payment of any mortgage, mortgage bonds, or interest coupons, of any other railroad connecting with said first named railroad." 2 Mills Ann. Stat. (1891) § 3751; Colorado R. S. 1908, § 5412.

"Any railroad company owning or operating a line of railroad in this state may purchase other lines of railroad within or without this state which shall connect with the road operated by such company, directly, or by means of any other line which such company shall have the right by contract or otherwise, when constructed, to use or operate and may acquire and may hold, the obligations and stock of other companies owning or operating any such line of road which such company is so authorized to purchase or which, under the laws of this state, it is authorized to lease, or with which under said laws it may be authorized to consolidate. * * *" Colorado S. L. 1899, p. 313; Colorado R. S. 1908, § 5418.

"Railroad corporations organized under the laws of Utah * * * may purchase or otherwise lawfully acquire the railroad * * * and the capital stock * * * and the bonds and other obligations, or any part thereof, or may guarantee the stocks, bonds or obligations of any corporation owning * * * railroad lines within this state, or partly within and partly without the same, * * * which connect with the line of railroad of such corporation. * * *" Utah Sess. Laws 1901, p. 22, § 5.

Chadbourne & Shores, of New York City (John G. Milburn and A. J. Shores, both of New York City, and Henry McAllister, Jr., of Denver, Colo., of counsel), for appellant.

Murray, Prentice & Howland, of New York City (George Welwood Murray and F. W. M. Cutcheon, both of New York City, John F. Bowie, of San Francisco, Cal., and Ralph M. Arkush and William Roberts, both of New York City, of counsel), for appellee.

Before ROGERS and HOUGH, Circuit Judges, and MAYER, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). The summary prefixed hereto is thought to present, not only the facts and acts relevant to the legal issues involved, but most of the surrounding circumstances showing motive (as the parent of intent) in so far as, and probably farther than we are permitted, in discovering intent, to go beyond the ordinary meaning of the words employed in contract making.

Plaintiff has a money decree in an amount representing on actuarial principles the present value at date of decision below, of the security whereof the trustee asserts its bondholders have been deprived, namely, the Denver Companies'[2] obligation to pay or effect payment of interest on a bond issue until such time as the same should be paid in full; and the reason why such decree should run against defendant, is said to be its total breach of contract B.

It outlines argument and will perhaps render our position clearer, to state appellant's reasons as we understand them, for declining responsibility in respect of this matter. It is said:

(1) The obligation assumed by the Denver Companies under article 2, §§ 4 and 5, of contract B, was contingent only, i. e., dependent upon an ascertainment of insufficient earnings by Pacific Company; and no independent direct liability to the trustee can be found in that document.

(2) But if any liability of any kind can be found therein, it must be limited to such interest accruals, as arose before (a) the trustee declared the mortgage debt due for defaults, or before it began foreclosure; or before (b) the actual sale in foreclosure of the mortgaged estate; or before (c) the purchasers by their creature the present Pacific Company abrogated contract B.

(3) Unless contract B is construed as imposing a contingent liability only, dependent on acts long since rendered impossible by the conduct of plaintiff or its privies or cestuis que trustent, it is ultra vires.

(4) Under any view of defendant's liability, the principles on which the amount decreed was liquidated, were erroneous.

[1] 1. It may be admitted that the form of a contingent, secondary, or dependent obligation affecting the Denver Companies, is carefully preserved in every section, separately considered, of the agreement

---

[2] This phrase is used to designate the Old Denver and Western Companies as joint and several parties to contract B, and the New Denver as their successor in obligation.

in suit. But liability cannot depend on one phrase, nor to be limited to one section; what a party is bound to do is the resultant of all his promises as collected from the entire statement of purpose; it is the legal total of his assumptions. Further if mutual promises are made, the nature and extent of one party's obligation may frequently be learned from, if not stated in terms of the other's engagements.

Contract B declares that Pacific Company will devote to the payment of interest a proper part of its net income, if any it has. But it also presupposes a possible, indeed probable, deficiency in such income, and it recognizes possible refusal or neglect to pay out the same; whereupon arises a liability on the part of the Denver Companies to purchase notes of Pacific Company at par to an extent sufficient to produce (inter alia) the interest moneys. Pacific Company, to the extent of its ability, is to put its fiscal agent in funds to pay interest at appropriate dates; and Denver Companies are to pay to the trustee out of the fund produced from the Pacific Company's notes, enough to make up any deficiency in the moneys semiannually furnished for interest payments by Pacific Company; yet Denver Companies cannot wait to get notes before making up the full interest semiannually due, although such advance without notes is not to diminish their absolute right to enforce the delivery of the same, namely, of obligations which Pacific Company was to pay substantially when it was possible.

If one had nothing but the words of contract B to study, what conditions are suggested by that instrument under which the Denver Companies did not promise to furnish the interest moneys, as and when they fell due, and to the trustee? Lack of earnings, delay, refusal, open breach of its own covenants on the part of Pacific Company—none of these things affected the promise of Denver Companies to pay out of a fund, perhaps nonexistent at date of promised payment, an amount measured or measurable only by the extent of Pacific Company's inaction. The fund (so-called) Denver could then sue for, or otherwise obtain. It was no business of the trustee whether or when or how the fund derived from notes and measured by Pacific Company's poverty or dishonesty was obtained; that lay between the other parties to the contract.

Thus when the stated obligations assumed by Denver Company are totaled, the only contingency or condition to liability for a deficiency of perchance 100 per cent. was the bald fact that Pacific Company did not hand over the money on time to its fiscal agent. That the promised money is always described as coming out of a fund derived from notes is true; but when it is expressly provided that the payment is due and owing, whether the notes are existent or not, and no duty rests on the payee to get notes, the net or resultant obligation of the Denver Companies is contingent only in name—on the face of the contract itself—and how completely this formal or paper contingency was under Denver control has been sufficiently indicated in the statement of facts. There was no contingency, there was nothing on which payment depended, that did not depend on Denver Companies' will.

For these reasons, we regard contract B as plainly, though by a most circuitous and involved method, imposing a direct duty on Den-

ver Companies to pay to or through the trustee, whatever part of each semiannual interest installment Pacific Company did not timely provide, and charge such payment or payments to a sort of note account they were to keep with said company. This is our interpretation of the words of the contract, without any reference to the occurrences preceding this suit.

[2] 2. The contention that, whatever may have been the Denver Companies' obligations under contract B, they were terminated by the act of plaintiff, or of some person or entity for whose action plaintiff is responsible, or must suffer, is another matter requiring a view of the whole contractual scheme, rather than single or detached paragraphs. For if each act or event said to terminate liability is singly considered, express authority for it is discoverable in the written agreements. Thus the makers of contract B stated their cognizance of and satisfaction with the mortgage, and every step of the foreclosure was in accord with that instrument; so was prematurity of debt on default; while abrogation, cancellation, or repudiation of the contract by some party or parties, was contemplated, and provided against by the clause that no one could in any way get rid of article 2, §§ 4 and 5. As for the effect of judicial sale, since the sale itself was a necessary part of foreclosure, was at a price fixed after notice to defendant and with its full knowledge, and is not suggested as being tainted with fraud, we fail to see how the disparity between cost and selling price affects this litigation in any way. It is not, we apprehend, the amount realized by sale, but the fact that there was a sale, which is relied on to terminate liability, though it may be noted that the market prices of new Pacific bonds seem to justify the upset price, if the matter be of any importance.

But upon the whole scheme of financial assistance, as elaborated through contracts and mortgage, it is confidently asserted that since nowhere is it definitely and clearly said that Denver Companies were to be forever tied to a financial corpse, since they nowhere agreed to do more than help a fellow corporation by loaning it money for certain purposes—even if they also promised to see to the application of said money to those purposes—such an obligation and liability must terminate when the person to be aided is to all intents and purposes dead, and the conditions assumed as the basis of and reasons for the obligor's liability no longer exist.

The contention at once suggests one retort, or reply, which will be considered when treating of damages, namely, was the pecuniary death of Pacific Company caused by any of the acts complained of, or was defendant itself the proximate cause of decease? But still considering only the language of contract, we are of opinion that, amazing as is the machinery of words employed, it was within the expressed contemplation of the parties that Pacific Company might in any way, and for any purpose, neglect or refuse to pay its interest; that default, foreclosure, and sale might ensue, and yet Denver Companies agreed to keep on paying interest, and hopefully looking to Pacific Company, by suit perhaps, to furnish the notes out of which the interest was theoretically to flow. Nothing better illustrates this than the singular

provision that the obligations of the contract are to follow lines of rail, like covenants running with land. But this legal curiosity did not affect the trustee, to whom was promised money; the other parties might arrange among themselves as to how it was to be obtained and in what way charged or accounted for.

We therefore conclude that none of the acts or facts in question operated to terminate or abrogate sections 4 and 5 of article 2, nor (in and of themselves) to release defendant from whatever measure of liability contract B imposes, for each was clearly within the contemplation of parties, as discovered by or from words employed, and so was their aggregate effect—which is what defendant complains of.

[3] 3. The phrase "ultra vires" as used in this case rather suggests the nature of a defense, than describes it with technical accuracy.

Since the Old Denver did not "connect" with the Pacific, there was no statutory power to guarantee the latter's bonds, either as to principal or interest; but the Western did so connect, and the present defendant is as much and as fully the successor in interest and obligation of the Western as of the Old Denver; the covenants of contract B are several as well as joint on the part of the two corporations now merged or united in this defendant. Therefore it would be of no avail to urge that the contract is an illegal guarantee, for the New Denver as the inheritor of the Western would be liable, and does physically connect with the Pacific by virtue of the Western's connection.

Consequently it is urged that every endeavor was made by the contracting parties to avoid anything that in law could be called a guaranty. We think this quite true, and the reason for it was that the Old Denver which was the strong partner in the enterprise could not guarantee. Therefore contract B is (and here there is agreement in argument) a plain effort to create some kind of obligation equally effective against both Denver Companies, and resting for statutory validity on the authority found in both Colorado and Utah, to purchase and hold the obligations of a railroad situated as was the Pacific. Thus a question of statutory construction is reached, and it is maintained that the acts quoted above (1) do not authorize an agreement compelling the purchase of obligations for a period of nearly 30 years, but (2) if so extreme a power can be found, it can only be validated by limiting such promise to paying for obligations given by a concern capable of making earnings, i. e., a going railway, not a mere corporate name. Thus the contention is that any construction of contract B producing a liability greater than the defendant is substantially ready to concede results in a statutory violation.

We have already found in the language of the parties plain and definite statements of purpose to do the very things now said to be against the statute properly construed, and we think it quite as plain that such purpose was to give a security that was just as good as a guaranty. The result aimed at is shown by numerous minutes of directors' and shareholders' meetings, and is also proven by the direct guaranty indorsed by the New Denver on all bonds offered as soon as statutory authority was conferred. That act perfectly expressed original desire.

250 F.—22

Thus we are brought to what we regard as the crux of this discussion: Did a power to buy obligations justify or authorize a covenant to buy the same, at recurrent intervals stretching over many years, irrespective of their value, or of conditions unthought of when contract made, and productive of radical change of relation between the contracting parties?

While the point is barren of direct authority in the states of the statutes, yet we consider it solved by some general principles of corporate action, as applied to the admitted facts herein.

A corporation may within the boundaries of legal action make any contract for its corporate benefit upon proper consideration; its agreement may be conditional as well as direct, and the lawful end to be obtained is often if not usually the test of corporate power. Ellerman v. Chicago, etc., Co., 49 N. J. Eq. at page 248, 23 Atl. 287; Railway Co. v. Keokuk Bridge Co., 131 U. S. at page 385, 9 Sup. Ct. 770, 33 L. Ed. 157; Tod v. Kentucky, etc., Co. (C. C.) 57 Fed. at page 58.

It was apparently an advantageous thing for the Denver to create and use Pacific Company. It was plainly within statutory corporate authority to buy the notes of the latter corporation. If one note could have been bought, so could thousands, and, within the strictest letter of the statute, Denver could at one time have bought enough notes from Pacific to provide for mortgage interest during the mortgage term, after complying with certain California requirements as to relation between obligations and stock. The illustration is a practical absurdity, but it serves to show that the objection advanced goes only to the quantum of the liability, and on this the statute is silent. It can make no difference as to quantum that the amount is spread out over a generation instead of being expended at once. The arrangement made was but a detail of business.

The argument that purchasing anything reasonably called obligations implies a solvent or going obligor is but a variant of the first objection. If an agreement to purchase in futuro is no more than the splitting up of a present power to purchase, the question cannot be of the advantage to the purchaser when the time of buying arrives, but of the sufficiency and legality of the consideration when agreement made. An agreement valid when made is unaffected by the subsequent insolvency of one party, and that there was apparent advantage and legal "value" in the consideration of contract B needs no more than mention.

It follows that we do not regard the liability imposed on defendant as forbidden by the statute.

[4] 4. By the foregoing discussion, it is shown that we think contract B an obligation to buy at par enough Pacific notes to pay interest on a certain debt, until that debt should be discharged; also, an obligation within statutory authority, made on valuable consideration, and enforceable by the trustee under the pledge of the mortgage, but wholly independent of said mortgage, and unaffected by any act done pursuant to the terms of mortgage.

This action is to recover damages for breach of such a contract, and in order to assess the same it is as always necessary to inquire as to the nature of the breach, by whom committed, what if anything has been

done to minimize damages, and what amount will compensate the injured party; compensation being the invariable object of assessment, except in respect of punitive recoveries.

It is to us plain that defendant committed breach of contract by (pursuant to threat of September, 1914) refusing "to continue financial support" of Pacific Company on March 1, 1915. If thereafter that company financially died, defendant inflicted the blow proximately causing decease, however moribund Pacific Company may then have been.

The reasons for such action are illuminating as to the intended extent of breach. By 1915 Pacific owed Denver over $50,000,000 practically unsecured, and was doing a business poor and apparently getting worse under the rivalry of the Panama Canal. Denver Company could be no worse off by meeting its fate at once, than by being bled for decades. Therefore it refused longer to observe its contract, and invited suit to ascertain the nature of its agreement and extent of liability.

It is now held that its agreement was to pay all the semiannual mortgage interest (if necessary) until some one paid the principal; that, while defendant did not and does not deny some liability, it denied that liability, and denied it utterly; therefore its breach was total. It is true that by no form of words uttered or sent to plaintiff did defendant say, "We will never pay any more interest on Pacific bonds," but that idea was conveyed to all inquirers and published widely. There was an admitted refusal to pay on March 1, 1915. We think that the circumstances of that refusal warrant a finding of refusal to pay anything more, and Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, is fully applicable.

The obligation of contract B being wholly independent of the mortgage, the total breach thereof could only be compensated by the value of the repudiated security, less any solatium received from other sources. The present value of an agreement to secure the payment of 5 per cent. a year on a given sum for nearly 30 years is greater than the sum itself, but, since the obligation was terminable by paying the debt (the Pacific bonds could have been called long before maturity), the principal debt was the limit of liability, and that was diminished by what plaintiff's bondholders got in foreclosure. The damages below were assessed substantially on this principle, and as we find correctly on reason and authority. Central Trust Co. v. Chicago, etc., Co., 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; In re Fitz George, 1 K. B. (1905) 462; Marbury v. Kentucky, etc., Co., 62 Fed. 335, 10 C. C. A. 393; Penna. Steel Co. v. New York, etc., Co., 198 Fed. 721, 117 C. C. A. 503; Ches. & Ohio R. R. v. Kelly, 241 U. S. 485, 36 Sup. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367—which cases cover admeasurement of recovery, without necessary reference to presence or nature of "breach."

[5] Believing that a liability on the part of defendant and to plaintiff was established in the amount found by the lower court, we should affirm the decree as it stands were it not for a jurisdictional question too apparent to avoid.

The court below had jurisdiction of the subject-matter, the defendant waived its right to be sued in its own district (if such right ever existed), and plaintiff's pleading purported to set forth a cause of action cognizable in equity; that is, it asserted a lien upon the defendant's property, or a priority amounting to a lien over certain obligations created by defendant.

. No such lien or priority was found by the trial court because none was proven, and it is plain to us from the record that none existed or exists. Assuming that the case as pleaded was one in equity, the case as proven was no more than an action at law for damages occasioned by the total breach of a contract summarily but correctly described by plaintiff as one to maintain Pacific Company as a going concern—an active railway capable of earning if not profitable. The decree is in effect a judgment at law, and the case should have been transferred to the law side of the court under the Act of March 3, 1915, c. 90, 38 Stat. 956 (Comp. St. 1916, §§ 1251a–1251c). Nor was this suit in any way "dependent" in the sense of jurisdiction arising only out of some other jurisdictional power.

This question of jurisdiction was never raised, and it is evident to us that by consent and at the desire of both plaintiff and defendant an action at law was tried as a suit in equity, for what reason we know not. This record is that of a law action tried by consent without a jury, except for the paper required by Rev. Stat. §§ 649 and 700, Jud. Code, § 291 (Comp. St. 1916, §§ 1012, 1668, 1268), namely a consent to waive a jury. As this defect is not jurisdictional and is not assigned for error or otherwise complained of, we disregard it.

This action was brought into this court by an appeal. As it was really from a judgment at law, a writ of error would have been proper, but under section 4 of the Act of September 6, 1916 (39 Stat. 726, 448, Comp. St. 1916, § 1649a) we may, and indeed must, disregard this procedural oversight. The power of transferring a case to the proper side of the court exists in our opinion at any stage of the litigation, and we may give the direction as well as the District Court.

This matter, which we consider of our own motion, is not merely formal, but substantial, though, as just pointed out, it does not go to the root of the case under the statutes cited.[3] The error was this: Plaintiff brought in equity that which was not an equity action, and thereby obtained injunctive relief, which when considered in the light of the case actually made amounted to a use of the writ of injunction as the substantial equivalent of a warrant of attachment. For this there was no warrant, in that it gave rise to an appearance of lien or priority, not justified by the evidence. Plaintiff has a money judgment for breach of contract and that is all. It is entitled to no further or greater priority than any other owner of a judgment on contract of the date of the entry of the so-called decree. This fact may become important, if it be true, as alleged in plaintiff's pleading, that the liability asserted against the defendant and now established by the judgment of the courts of this circuit is so great as to render the New Denver Company utterly insolvent.

3 Cf. Jackson v. Strong (N. Y. Ct. App.) 118 N. E. 512.

Apparently such asserted, if not hoped for, insolvency (hoped for in the sense of attempting to establish the liability), was one of the reasons for plaintiff's attempt to draw a bill in equity. That attempt has failed, and the failure must be definitely marked.

It is therefore ordered that this cause be remanded, with directions to the district court to transfer the same to the law side of the court, and as so transferred, that the judgment entered herein on June 14, 1917, be affirmed without costs. And it is further ordered that the several injunctions issued in the course of this litigation shall be forthwith vacated and set aside.