## GEORGE M. JONES CO. v. CANADIAN NAT. RY. CO. et al.

(District Court, E. D. Michigan, S. D. October 4, 1926.)

No. 7451.

**1. Sales ⟋89—Memorandum signed by parties to contract for sale of coal held to modify original contract by fixing definite price.**

A contract by a railroad company for purchase of 150,000 tons of coal, with daily deliveries, provided that the price should be the same as was received by seller under contracts with other railroads. The contract did not become effective when intended because of a strike, and the parties later signed a further agreement that deliveries should then commence, and the coal should be "billed at the rate of $3.50 net ton." *Held,* that such agreement modified the original contract by fixing a definite price.

**2. Sales ⟋75.**

Contract for sale of coal, providing that seller should bill it to buyer at stated price, has the effect of fixing the price.

**3. Words and phrases—"Bill."**

"Bill," as a verb, as generally and customarily used in commercial transactions, is synonymous with "charge" or "invoice."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bill; Charge; Invoice.]

**4. Sales ⟋75—Shipment, acceptance, and payment for coal at price named in contract held practical construction of contract as to price.**

Where a contract for sale of coal for daily deliveries provided that it should be billed at a stated price, such billing, and acceptance and payment for shipments, for four months, was a practical construction of the contract, which precluded either party from claiming that such price was tentative only and subject to revision.

**5. Sales ⟋89—Agreement modifying contract held not without consideration.**

A subsequent memorandum, executed by the parties to a contract fixing definite price in lieu of provision of original contract, *held* not without consideration, when modifying original contract in several other respects to the advantage of the buyer.

**6. Sales ⟋38(5)—Supplemental agreement for sale of coal held not invalid for fraud or deception, though seller did not inform buyer of certain facts.**

A contract for sale of coal to a railroad company provided that the price should be the same as received by seller from other railroads.

Later a supplemental agreement fixed a definite price. *Held,* that such agreement was not avoidable for fraud, because seller did not advise buyer that it was then in negotiation with another company, which resulted later in a contract at a lower price.

**7. Interest ⟋19(1)—Denial of liability on contract does not make sums due by its terms unliquidated and not subject to interest.**

Where the amounts due under a contract of sale were fixed by its terms, buyer cannot avoid payment of interest on the ground that, because it denied liability, the claim was unliquidated.

**8. Interest ⟋28—Where interest is awarded merely as damages for breach of a contract, the rate is governed by the law of the state where the court sits.**

Where interest is not specified in a contract, but is awarded merely as damages for its breach, the rate is governed by the law of the state where the court rendering judgment is located.

At Law. Action by the George M. Jones Company against the Canadian National Railway Company and others. Trial to court, and judgment for plaintiff.

Warren, Cady, Hill & Hamblen, of Detroit, Mich., and Tracy, Chapman & Welles, of Toledo, Ohio, for plaintiff.

H. R. Martin and L. J. Carrigan, both of Detroit, Mich., for defendants.

TUTTLE, District Judge. This is an action brought by the George M. Jones Company, an Ohio corporation, against certain railroad companies, constituting and known as the Grand Trunk Railway System (which will be hereinafter referred to as the defendant), to recover approximately $57,000 alleged to be due, for principal and interest, as the unpaid balance of the purchase price of approximately 150,000 tons of coal sold and delivered by plaintiff to the defendant under a written contract as later modified. A jury has been waived by the parties in the statutory manner, and the cause heard by the court without a jury. The material facts and questions involved are as follows:

[1] On November 25, 1921, the parties entered into the following written contract for the sale of said coal:

"Bought of the Geo. M. Jones Company, Toledo, Ohio:

"Quantity. 150,000 tons, to be shipped at the rate of not less than ten cars daily after April 1, 1922. The shipment of this total tonnage is not to be affected by suspension of mining operations.

"Kind and Grade. Hocking mine run from mines of the seller located on the H. V., T. & C. C. or Z. & W. Railways. Quality to

be satisfactory to the Grand Trunk Railway System.

"Price. Per net ton of 2,000 lbs. f. o. b. cars mine. To be the same as paid the seller by other railroads on contract for mine run coal from the Hocking district at the time this contract becomes effective.

"Terms. Payment on or before the 25th of each month for all coal shipped during the previous month. The buyer agrees to furnish Grand Trunk System cars for all shipments covered by this contract.

"Delivery. Approximate monthly tonnage, 12,500 tons.

"Expiration. This contract expires when the 150,000 tons have been shipped.

"Weights. Railroad weights at point of shipment to govern all settlements.

"Prompt payment is of the essence of this contract; and if default shall be made by the buyer in the payment of any amount that may be due hereunder as the same falls due, this contract may be cancelled at the option of the seller.

"The prices named in this contract are based on the present mining rate, and shall advance or decline as said mining rate shall advance or decline, during the life of this contract."

From April 1, 1922, until the latter part of August, 1922, a general miners' strike was in progress, and no coal was shipped by the plaintiff to the defendant, or to any other railroad company during that period. No objection nor complaint was made by the defendant to this failure to make shipments, both parties recognizing and acquiescing in the impossibility of shipping in accordance with the terms of this contract. Immediately on the termination of the strike, and on August 29, 1922 (before there had been any other communications, acts, or conduct of either of the parties with respect to the performance or breach of the contract in question) the general purchasing agent of the defendant, George W. Caye, wired the plaintiff as follows: "What are your plans for shipping us coal agreed upon last November and what are your price views on same." On the same day the defendant answered this wire with the following telegram: "We are just getting our mines started. Expect to be able to advise you something definite about shipments not later than first of next week and will see you to discuss price a little later." September 25, 1922, the general sales manager of the plaintiff, H. D. Thomas, wired the general purchasing agent of the defendant as follows: "Would like appointment with you for Thursday to discuss contract. Please wire if you will be in Montreal on that date." September 28, 1922, Mr. Caye wired Mr. Thomas: "Yes, will be in Montreal Thursday this week." September 28 and 29, 1922, Mr. Thomas, representing plaintiff, and Mr. Caye and his assistant, George H. Jenkins, representing the defendant, conferred on this subject at the offices of the defendant in Montreal, and as a result of that conference, and at its conclusion, on September 29, the following communication was dictated by Mr. Jenkins to his stenographer in his office, handed to Mr. Caye and read and signed by him, and then handed to Mr. Thomas and read and signed by him; one copy being left with the defendant's officers and the other taken away by the plaintiff's representative:

"Geo. M. Jones Coal Co., Toledo, Ohio—

Gentlemen: Referring to conversation with your Mr. H. D. Thomas in Montreal to-day, in regard to shipments to be made to apply on 150,000 ton contract of November 25, 1921, it is understood you will endeavor to commence shipments in the early part of next week at rate of about 15 cars per working day, using drop bottom equipment.

"We will at once take up with our car service department at Chicago and see if they are in a position to commence delivering empties for the above, and will advise you shortly what they say. In the meantime, please make every effort to secure foreign shipments until our cars arrive at mines.

"It is possible the 15-car arrangement referred to above may be altered up or down to meet our requirements, and if necessary to do this it is understood you will meet our wishes as far as practicable.

"Cars should be consigned to our company at Gillen Yard, Mich., and routed over Shore Line from Toledo.

"It is understood above coal will be billed to us at the rate of $3.50 net ton on cars at mines, and that shipments will be made from points on Hocking Valley, taking present rate of not exceeding $2.37 to Gillen Yard, Mich.

"Quality of coal to be satisfactory to us.

"If the foregoing is in accordance with your understanding, please acknowledge receipt by initialing one copy of this letter.

"Yours truly,

"Geo. W. Caye, Gen. Pur. Agent.

"Accepted: The Geo. M. Jones Co., H. D. Thomas, Sept. 29, 1922."

Beginning October 3, 1922, and continuing until the spring of 1923, plaintiff shipped to defendant slightly more than the quantity of coal required by this contract, all of which coal was accepted and used by defendant. During the same period plaintiff sent to de-

fendant invoices for all of this coal at the rate of $3.50 per ton, and defendant paid plaintiff at such rate for all of such coal, except about 14,000 tons, the invoices for which last-mentioned quantity were approved for payment by the defendant's fuel department, but rejected by its treasury department after the defendant had taken the position, early in 1923, that the $3.50 rate was not a definite, final price, but merely a tentative, temporary figure. At no time between April 1, 1922, and October 1, 1922, was there any contract in force between the plaintiff and any railroad company for the sale of coal, although on September 28 and 29, 1922, negotiations were pending between the plaintiff and the New York Central Railroad Company, which resulted in the making of such a contract between them on October 2, 1922, effective for a three-year period commencing September 10, 1922, at a price of $3 per ton. After September 29, 1922, the market price of coal declined over the period during which the plaintiff was making the shipments to the defendant already mentioned. On January 16, 1923, the plaintiff wrote to the defendant as follows:

"As an inducement to you to extend your contract, and subject to prompt acceptance, we desire to submit the following proposition: If you will extend your contract for an annual tonnage of 150,000 tons per year for two years from April 1, 1923, when our present contract shipments should be completed, we will refund you 25 cents per ton on all shipments made under our present contract, or, if you prefer to extend the contract for a period of only one year for the above annual tonnage, we will refund you 25 cents per ton on the last 75,000 tons shipped under the present contract."

On January 31, 1923, the general purchasing agent of the defendant wrote to the plaintiff as follows:

"Will appreciate it if you will advise your views about final price to be paid for the coal shipped on order for 150,000 tons. You will recall original arrangement made November, 1921, did not fix a specific price; instead, the price was to correspond with that being paid by other railroads for their contract coal in your district.

"When Mr. Thomas was here in September last, the billing price suggested at that time was $3.50, and which has been used ever since. It was not my understanding, however, that $3.50 was final price, and in agreeing to it for the time being felt fair adjustment could be made at a later date, when the situation became clearer than it was then.

"Advices relative to our arrangement on above subject have been furnished by this office to our management, and in a little while it will be necessary to make a more specific report about the price feature. For this reason will appreciate your views at an early date."

This appears to have been the first statement made by the defendant to the effect that the price referred to was not a definite, final price. Plaintiff did not acquiesce in this claim of the defendant, and after considerable correspondence between the parties plaintiff commenced this action to recover on the basis already stated, claiming that the communication of September 29, 1922, hereinbefore quoted, evidenced and expressed an agreement between the parties modifying the original contract of November 25, 1921, and definitely fixing a price of $3.50 per ton for the coal thereafter shipped to, and accepted by, the defendant under such contract as so modified. Plaintiff claims also interest on the unpaid balance and on deferred payments made after the time agreed on for monthly payments under the contract.

Defendant urges four contentions in its defense, as follows:

(1) That the effect of the memorandum of September 29, 1922, was not to modify the original contract by fixing a definite final price of $3.50 per ton, but merely to provide a tentative, temporary price at which the coal should be shipped to the defendant pending a later readjustment of such price in accordance with the terms of the contract as originally executed; (2) that, if such memorandum be construed as providing for such a final price, there was no legal consideration for such a modification of the original contract, and such a modification, therefore, cannot be enforced; (3) that, if such memorandum be construed as evidencing such a modification, it was procured by the failure of plaintiff to disclose to the defendant, on September 29, 1922, the then pendency of its negotiations with the New York Central Railroad Company, which resulted, on October 2, 1922, in the closing of its contract with said railroad company for the sale to the latter of coal at the rate of $3 per ton; and (4) that, if the defendant be liable to the plaintiff for the balance claimed, the amount of such balance has been unliquidated; and that, therefore, plaintiff is not entitled to the interest which it claims thereon for the period prior to the entry of a judgment herein. These defenses and the questions thereby presented will be considered in the order named.

[2, 3] 1. I cannot agree with the contention

of the defendant as to the proper interpretation of the memorandum by which the original contract was modified. It seems clear to me that, when the parties expressly provided in the written memorandum in question that it was "understood" that the "above coal" (manifestly the entire quantity of coal called for by the original contract, as referred to in a preceding paragraph of said memorandum) should be "billed to" the defendant "at the rate of $3.50 net ton on cars at mines," the plain and unambiguous meaning of the language so used was, and is, that the coal so mentioned would be shipped and invoiced by the plaintiff to the defendant at the rate so specified, and that such rate would be paid to the plaintiff by the defendant. The meaning of the verb "bill," given by the Century Dictionary, is "to enter in a bill; make a bill or list of; charge or enter in an account for future payment." Webster's New International Dictionary defines the word as meaning "to charge or enter in a bill; to make a bill, inventory, or list of." The word is defined in 7 Corpus Juris, p. 1179, as "to charge or enter in an account for future payment; to book or charge on an account." It is a matter of common knowledge, of which this court will take judicial notice, that the word under consideration is generally and customarily used in business and commercial intercourse as synonymous with "charge" or "invoice." The assistant general purchasing agent of the defendant himself testified in this connection that "it is a word that we have ordinarily used in our contracts." He further testified that he knew of no peculiar meaning that the word had in the coal trade. The general sales manager of the plaintiff testified as follows: "The expression we used was 'billed,' which to us is synonymous with 'priced at,' or 'sales price.' The billed price could not be anything but sales price. That is all it is. The expression we used in the office is 'billing price.' We get an order with the sales price on it, and it is copied through our various forms in the office as the billing price. They are one and the same thing."

[4] In view of the uncertainty existing, with respect to the price of coal, at the time of the making of this memorandum, as is indicated by the inquiry made of the plaintiff by the defendant as to its price views, by the absence of any written contracts for the sale of coal by the plaintiff to any other railroad company, by the general demoralization in the coal trade immediately following the coal strike of that year, and by the record generally, it was reasonable and natural that the parties should at that time endeavor to make certain what had theretofore been uncertain and to fix a definite final price at which this coal should be sold and paid for. If, therefore, it be assumed that there was ambiguity in this language of the memorandum, the situation and circumstances surrounding the making of this supplemental arrangement strongly evidence an intent by the parties to thereby fix such a definite price. Furthermore, if such ambiguity be assumed, the action of the parties themselves, in the shipping and invoicing by the plaintiff, and in the acceptance and payment by the defendant, of this coal at this $3.50 price, over a period of four months without any suggestion on the part of either party that such rate was merely temporary or provisional, amounts to and constitutes a practical construction of this contract by the parties themselves, which now precludes either of them from asserting a different construction. Finally, it is a well-settled rule of construction that any ambiguity in a written contract should be resolved against the party by which such contract was prepared, and therefore, for this reason, if for no other, if the language here in controversy be assumed, as defendant claims, to be ambiguous on its face, it must be given the construction which I have already pointed out, which is, in my opinion, the proper one.

[5] 2. The contention of the defendant that the memorandum thus supplementing the original contract was not supported by a sufficient consideration to give it binding effect as a modification of such contract is clearly unsound and cannot be sustained. It will be noted that this memorandum, which was formally executed by both parties and is in a form which obviously was intended by them to give it effect as a contractual modification of, and supplement to, the contract as originally signed, by its terms changes and affects the terms of the original contract in several respects. For example, the requirement that this coal was "to be shipped at the rate of not less than 10 cars daily after April 1, 1922," was modified (to the advantage of the defendant and the disadvantage of the plaintiff), so as to require the plaintiff to endeavor "to commence shipment in the early part of next week at the rate of about 15 cars per working day, using a drop bottom equipment," and to require it to alter this "15 car arrangement referred to above * * * up or down to meet" the defendant's requirements, as far as practicable. The original provision, whereby the defendant agreed "to furnish Grand Trunk System cars for all shipments covered by this contract," was so modified, to the advantage of the defendant

rather than of the plaintiff, as to require defendant only to "take up with" their car service department the matter and to "see if they are in a position to commence delivering empties for the above," the plaintiff, "in the meantime," to "make every effort to secure foreign equipment." It cannot, therefore, be properly said that the agreement to change this price, connected and linked as it was with the other changes agreed on in the same instrument, was solely for the benefit of the plaintiff, and therefore unsupported by a valuable consideration. Neither can it be held that the obligation thus imposed on the plaintiff to accept a fixed, specified price in place of an indefinite, uncertain price, to be determined (if at all) in the future and dependent upon events which it could not then foresee, was not based upon any benefit accruing to the defendant or detriment arising to the plaintiff; and under such circumstances it is clear that such a change in the agreed method of determining the price was supported by amply sufficient consideration.

[6] 3. Nor can I agree with, or accept, the contention of the defendant to the effect that this supplemental agreement was obtained by fraud, because the plaintiff failed to disclose to the defendant its pending negotiations, which subsequently, and after the making of this agreement, led to the consummation of its contract with the New York Central Railroad Company. The record shows no express misstatements nor misrepresentations by the plaintiff in that connection, and I can find none implied from the circumstances. Even if the plaintiff had actually entered into its contract with the New York Central Railroad Company prior to the making of this supplemental agreement with the defendant, it is at least doubtful whether its mere failure to apprise the defendant's representative of that fact would have constituted such fraudulent concealment of a material matter, relied on by defendant, as to amount to fraud. Certainly, however, it is plain that the plaintiff was under no legal obligation or duty to inform the defendant that negotiations were in progress between it and any other railroad company which might thereafter result in a contract by it and such company. There was nothing in the situation, as it then appeared to the plaintiff, or as it is now shown to this court, to give the plaintiff any reason to suppose that the defendant believed, and was relying on its belief, that the plaintiff would not, during the performance of the contract between these two parties, as so modified, make other contracts with other railroad companies on other terms and conditions as to

price and otherwise, and the plaintiff could not, therefore, have assumed that the defendant, in entering into this supplemental agreement, was relying either on the future absence of any such other contract or upon the present absence of any negotiations looking towards the subsequent making of any such other contract. If that had been the attitude and position of the defendant, it would have been easy for it to so inform the plaintiff before the making of this modifying agreement, or to insert therein some condition to that effect. The present claim of the defendant to the contrary must be overruled.

[7, 8] 4. The objection by the defendant to the payment of interest upon unpaid balances and deferred payments after the date when such payments became due under this contract, as so modified, on the ground that the amounts so due were unliquidated, is manifestly without merit. These payments were due under the terms of an express contract, and not only was the obligation to make such payments contractual, but the amounts due thereon were fixed by, and could have been determined from, the very terms of such contract. The mere denial by the defendant of its liability in this connection cannot make the amounts of the payments, which were thus easily ascertainable and could have been readily liquidated, unliquidated within the meaning of the law. This proposition, as all of the others herein involved, is so elementary as to require no citation of authorities. The contentions of the plaintiff and of the defendant on this subject must be sustained and overruled, respectively. The plaintiff, however, claims, and the defendant appears to concede, that the rate of such interest must be computed according to the law of the state of Ohio, where this contract was made, and where it was agreed to be and was, performed. I cannot avoid the conclusion that both parties are in error in this respect. It will be noted that the contract does not mention nor provide for any interest; and the case therefore is not one for the application of the rule that, when a contract provides for the payment of interest, the rate of such interest is to be computed according to the law of the state where such contract was to be performed. Here the right to interest is not contractual, but remedial, and is awarded, not as a part of the debt recovered, but as damages additional to such debt. Herman H. Hettler Lumber Co. v. Olds (C. C. A. 6), 242 F. 456, 155 C. C. A. 232; New York Trust Co. v. Detroit, Toledo & Ironton R. Co. (C. C. A. 6), 251 F. 514, 163 C. C. A. 508. It is settled that, where interest is not specified in the con-

tract, but is awarded merely as damages for the breach thereof, the rate of such interest is to be computed according to the law of the state where the court rendering judgment thereon is located. Mather v. Stokely (C. C. A. 1) 218 F. 764, 134 C. C. A. 442; Equitable Trust Co. v. Western Pacific Ry. Co. (D. C.) 244 F. 485, affirmed in (C. C. A. 2) 250 F. 327, 162 C. C. A. 397. With this modification as to rate of the interest, plaintiff is entitled to recover the interest claimed by it.

A judgment may be entered in accordance with the terms of this opinion.